CONSOLIDATED GOLD FIELDS PLC, Gold Fields Mining Corporation, Plaintiffs–Appellees–Cross–Appellants,

Newmont Mining Corporation, Newmont Gold Company, Plaintiffs–Appellees,

v.

MINORCO, S.A., Defendant–Appellant–Cross–Appellee,

Anglo American Corporation of South Africa Limited and De Beers Consolidated Mines Limited, Defendants.

No. 641, Dockets 88–7932, 88–7944.

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1988.

Decided March 22, 1989.

---

**254**

Jeremy G. Epstein, New York City (Shearman & Sterling, New York City, on the brief), for defendant-appellant-cross-appellee.

Lewis A. Kaplan, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for plaintiffs-appellees-cross-appellants Consolidated Gold Fields PLC and Gold Fields Mining Corp.

Richard J. Holwell, New York City (White & Case, New York City, on the brief), for plaintiffs-appellees Newmont Mining Corp. and Newmont Gold Co.

(Daniel L. Goelzer, Gen. Counsel, Jacob H. Stillman, Assoc. Gen. Counsel, Thomas L. Riesenberg, Senior Special Counsel, Catherine A. Broderick, Counsel to Asst. Gen. Counsel, Anne H. Sullivan, Paul Gonson, Solicitor, Wash., D.C., filed an amicus curiae brief for the Securities & Exchange Commission.)

Before FEINBERG, NEWMAN, and ALTIMARI, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

The primary issue on this appeal is whether the target of a takeover and entities controlled by a target can demonstrate a threat of "antitrust injury" sufficient to confer standing to seek injunctive relief under section 16 of the Clayton Act against a takeover alleged to violate section 7 of the Act, 15 U.S.C. §§ 18, 26 (1982). Also at issue is the extent to which an American court may apply the anti-fraud provisions of American securities laws to a tender offer involving two foreign corporations and occurring on foreign soil, where only a small percentage of the target's shareholders are American residents. These issues arise on an appeal from an order of the District Court for the Southern District of New York (Michael B. Mukasey, Judge), 698 F.Supp. 487, granting a preliminary injunction that prevents appellant Minorco, S.A., along with co-defendants Anglo American Corporation of South Africa, Ltd. ("Anglo") and De Beers Consolidated Mines, Ltd. ("De Beers"), from proceeding with a tender offer to acquire all of the shares of Consolidated Gold Fields PLC ("Gold Fields").[1] Judge Mukasey issued the injunction after finding that two of the plaintiffs—Newmont Mining Corporation ("Newmont"), in which the target Gold Fields has a 49.3% stake, and Newmont's subsidiary, Newmont Gold Company ("Newmont Gold")—had proved a likelihood of success on their claim that the proposed acquisition of Gold Fields would violate section 7.[2] The District Court dis-

---

1. Shortly after Judge Mukasey granted the preliminary injunction, the British Secretary of State for Trade and Industry referred the Minorco bid to the Monopolies and Mergers Commission ("MMC") for investigation of the takeover's potential anticompetitive consequences in the United Kingdom with respect to strategic metals such as titanium and zircon. During the MMC's investigation, Minorco was prohibited under British law from proceeding with the tender offer. On February 2, 1989, the MMC announced that the proposed acquisition of Gold Fields would not operate against the British public interest. The MMC decision leaves the District Court's preliminary injunction as the only legal obstacle to consummation of Minor-

co's offer. On February 21, Minorco announced a new offer of $5.65 billion for the outstanding shares of Gold Fields, an increase over its initial bid of $4.9 billion. Minorco has informed us that it will not purchase shares pursuant to the new offer unless the injunction is vacated or modified.

2. Section 7 provides in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... of another corporation ... where in any line of commerce in any section of the country, the effect of such acquisition may be

missed for lack of subject matter jurisdiction plaintiffs' claim that the tender offer also violated sections 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e) (1982), and S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5 (1988), promulgated thereunder. Plaintiffs cross-appeal from the District Court's denial of antitrust standing to Gold Fields and its wholly owned American subsidiary, Gold Fields Mining Corporation ("GFMC") and the dismissal of the securities claims.

We conclude that all the plaintiffs in this case—the target as well as the target-controlled entities—have demonstrated a threat of "antitrust injury" sufficient to warrant the issuance of a preliminary injunction. We therefore affirm the District Court's grant of injunctive relief under section 16 but reverse that Court's denial of standing to Gold Fields and GFMC. Regarding the fraud claims, we conclude that the tender offer had sufficient effects within the United States to warrant application of American securities laws and that the District Court should have asserted subject matter jurisdiction over those claims. Accordingly, we remand the fraud claims to the District Court for further proceedings and a determination as to what remedy, if any, consistent with principles of international comity, should be granted.

### Background

#### A. The Parties

Gold Fields is a British corporation with significant holdings in the United States. It is engaged primarily in the exploration, mining, and sale of natural resources, especially gold. Half of Gold Fields' $2.4 billion in assets are located in the United States. Gold Fields wholly owns GFMC, a Delaware corporation headquartered in New York with gold mining operations in California and Nevada. The crown jewel of Gold Fields' assets is its 49.3% stake in Newmont, a Delaware corporation headquartered in New York. Newmont, in turn, owns 90% of Newmont Gold, the largest gold producer in the United States. In addition to these American interests, Gold Fields has significant holdings in Australian gold mining operations, as well as a 38% ownership interest in Gold Fields of South Africa Limited, the second largest gold producer in South Africa. Gold Fields and its associated companies account for 12% of the western world's gold production, making it the second largest gold producer in the non-communist world.

Minorco is a Luxembourg corporation, whose principal assets are shareholdings in companies engaged in natural resource production and exploration, including a 29.9% interest in Gold Fields. Minorco is controlled to a large extent by co-defendants Anglo, a South African corporation, which owns 39.1% of Minorco, and De Beers, also a South African corporation, which owns 21% of Minorco. The Oppenheimer family of South Africa owns 7% of Minorco. Anglo has extensive gold mining operations in South Africa, as does the Oppenheimer family, which allegedly controls Anglo, De Beers, and Minorco. In addition to ownership interests in the three defendant companies, the Oppenheimer family has a number of its members and close associates on the boards of the companies. Considered together, the Minorco group is the largest producer of gold in the non-communist world, accounting for 20.3% of all gold production in the western world.

#### B. The Tender Offer

In October 1988, Minorco commenced its offer for the 70% of Gold Fields' stock it does not already own. Of the 213,450,000 Gold Fields shares outstanding, approximately 5,300,000 (2.5%) are held by United States residents. Of these shares, approximately 50,000 shares are held directly by residents, 3.1 million shares are held indirectly through nominee accounts in the United Kingdom, and about 2.15 million shares are owned through the ownership of American Depository Receipts (ADR's), documents that indicate ownership by an American of a specific number of shares in a foreign corporation held of record by a

---

substantially to lessen competition, or tend to create a monopoly.

15 U.S.C. § 18 (1982).

United States depository bank. The ADR depositories also have nominees in the United Kingdom.

In its offering documents, Minorco stated that the offer "is not being made directly or indirectly in, or by use of the mails or by any means or instrumentality of interstate or foreign commerce or of any facilities of a national securities exchange of, the United States of America, its possessions or territories or any area subject to its jurisdiction or any political sub-division thereof." Minorco sent the offering documents to the United Kingdom nominees for United States resident shareholders. Minorco did not mail offering documents to the United States resident shareholders who own Gold Fields shares directly, but the documents stated that Minorco would accept tenders from United States residents as long as the acceptance form was sent to Minorco from outside the United States.

### Discussion

### I. The Antitrust Claims

#### A. The Need for a Hearing

Before turning to the principal issues before us, we must first consider appellant's claim that Judge Mukasey should have held an evidentiary hearing before granting the preliminary injunction, rather than ruling on the basis of the discovery record before him. This Court has held that "[o]n a motion for a preliminary injunction, where 'essential facts are in dispute, there must be a hearing ... and appropriate findings of fact must be made.'" *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir.1987) (quoting *Visual Sciences, Inc. v. Integrated Communications, Inc.*, 660 F.2d 56, 58 (2d Cir.1981)). However, *Fengler* does not stand for the proposition that a hearing must be held in all preliminary injunction cases. As Judge Feinberg has noted, "[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or

that the court can in no circumstances dispose of the motion on the papers before it." *Redac Project 6426, Inc. v. Allstate Insurance Co.*, 402 F.2d 789, 790 (2d Cir.1968). While some factual disputes may require an evidentiary hearing, more global matters, such as determination of the relevant market, may be decided by a judge on the basis of the paper record. *See SEC v. Frank*, 388 F.2d 486 (2d Cir.1968).

■ The voluminous and comprehensive record in this case provided a more than adequate source for Judge Mukasey's factual findings. Moreover, the record indicates that Minorco never requested a hearing. The only apparent reference to a hearing in Minorco's extensive submissions to the district court is found on page 103 of Minorco's memorandum in opposition to the preliminary injunction, and that reference merely restated the general principle set forth in *Fengler*. Such an oblique "request" was insufficient to preserve Minorco's right to a hearing. Minorco, having been content to rest on affidavits submitted to the District Court, waived its right to an evidentiary hearing. *See Fengler v. Numismatic Americana, Inc., supra*, 832 F.2d at 748;[3] *see also SCM v. Xerox Corp.*, 507 F.2d 358 (2d Cir.1974) (affirming denial of antitrust preliminary injunction without a hearing).

#### B. The Preliminary Injunction

In this Circuit, a court may issue a preliminary injunction only upon a "showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). We may reverse such relief only if the District Court exceeded its discretion in granting the injunction—that is, if it applied an incorrect legal standard or relied on a clearly erroneous finding of fact. *See AMR Services Corp.*

---

**3.** At oral argument, appellant's counsel was asked whether Minorco wanted a remand for an evidentiary hearing. Appellant later informed the Court that it no longer desired a hearing.

*v. International Brotherhood of Teamsters,* 821 F.2d 162, 163 (2d Cir.1987) (per curiam).

1. *Likelihood of Success.* The District Court concluded that the proposed acquisition would substantially lessen competition in the non-communist gold market because it involved a combination of entities holding market shares of 20.3% (Minorco) and 12% (Gold Fields). However, the District Court determined that only two of the plaintiffs— Newmont and Newmont Gold—could demonstrate that the resulting post-acquisition entity threatened them with "antitrust injury." In order to obtain injunctive relief under section 16,[4] plaintiffs must show a threat of "antitrust injury," *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), that is, injury "'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Id.* at 113, 107 S.Ct. at 491 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). Applying the principles set forth in *Cargill,* the District Court granted standing to Newmont and Newmont Gold but denied standing to Gold Fields and GFMC.

a. *Standing.* Newmont and Newmont Gold contend that once the takeover is complete, Anglo and the Oppenheimer family, through their control of Gold Fields' 49.3% ownership in Newmont, would attempt to shut down the company. In essence, Newmont's claim is that its ability to compete in the marketplace will be reduced by anticompetitive influence, exercised from inside its own boardroom. The factual basis for this claim is that production costs in South Africa, where Anglo has its mines, are rapidly rising and considerably higher than those in the United States, where Newmont and Newmont Gold have their mines. The contention, based on these facts, is that after the acquisition Minorco, fearing the day when gold mining in South Africa will become unprofitable, would maximize its

profits by concentrating in the short run on South African gold production and use its interests in Gold Fields and Newmont to limit production outside of South Africa. Anglo, it is contended, has an added incentive to have Minorco pursue this policy because its interest in South African mines and hence its share of profits on gold from those mines is much greater than its interest and hence share of profits will be in non-South African gold mined after the acquisition. Anglo thus would have an incentive, the District Court concluded, to limit production at the more efficient non-South African mines within the Gold Fields group, including the Newmont companies. Anglo, through Minorco, would cause Newmont to restrict its output, thereby reducing competition in the non-communist gold market.

■ We agree with the District Court that Newmont and Newmont Gold have demonstrated a threat of "antitrust injury." It has become axiomatic that the antitrust laws were enacted "for the protection of *competition,* not *competitors.*" *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original). In *Cargill,* the Supreme Court denied injunctive relief to a competitor who sought to block the merger of two rival companies. The competitor claimed that it would suffer reduced profits as a result of the increased competition from the merged entity. The Court held that it would be a "perverse result" if the antitrust laws could be used to "render illegal any decision by a firm to cut prices in order to increase market share." *Cargill, Inc. v. Monfort of Colorado, Inc., supra,* 479 U.S. at 116, 107 S.Ct. at 492. In this case, however, Newmont contends that it would suffer reduced profits because the takeover will enable outside corporate forces to cause it to restrain its own competitiveness and thereby reduce competition in the relevant market. Newmont's threatened injury is precisely the type that

---

**4.** Section 16 provides, in pertinent part:
Any ... corporation ... shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction

over the parties, against threatened loss or damage by a violation of the antitrust laws....
15 U.S.C. § 26 (1982).

the antitrust laws were designed to protect against. *See F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 818–19 (2d Cir.1979) (per curiam).

The question of whether the target itself, Gold Fields, and its subsidiary GFMC, have standing to seek injunctive relief under section 16 is a thornier problem. Some courts have held that target companies lack standing under the antitrust laws. *See Central National Bank v. Rainbolt*, 720 F.2d 1183, 1187 (10th Cir.1983); *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir.1980) (per curiam); *Carter Hawley Hale Stores v. Limited, Inc.*, 587 F.Supp. 246 (C.D.Cal.1984). These cases subscribe to the theory that a target cannot claim "antitrust injury" because after a takeover it will become "part of the very entity that it claims will have a supercompetitive advantage," and it therefore suffers no antitrust harm." *Id.* at 250. A number of commentators support this view. *See, e.g.*, II P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 340.2i, at 368–70 (Supp.1988); Easterbrook & Fischel, *Antitrust Suits by Targets of Tender Offers*, 80 Mich.L.Rev. 1155 (1982).

 This Circuit has previously upheld target standing to challenge takeovers alleged to violate section 7, and we reaffirm that position today. In our view, Gold Fields has demonstrated a threat of "antitrust injury." If the acquisition is permitted to go forward, Gold Fields will lose its ability to compete independently in the gold production market. Its wholly owned United States mining subsidiary, GFMC, is threatened with curtailment of its production, much like Newmont. Surely Gold Fields' loss of independence is causally linked to the injury occurring in the marketplace, where the acquisition threatens to diminish competitive forces. Though what happens to Gold Fields and what happens to competition may not be precisely the same type of injury, there is a common

element in that the independent existence of a major competitor is being eliminated.[5] It is not a sufficient answer to say that even though competition is diminished, Gold Fields is not injured because of its absorption into the Minorco group. The enlarged entity that emerges from the takeover may benefit from the acquisition, but Gold Fields will have lost one of the vital components of competition—the power of independent decision-making as to price and output. It is hard to imagine an injury to competition more clearly "of the type the antitrust laws were intended to prevent," *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, *supra*, 429 U.S. at 489, 97 S.Ct. at 697, than the elimination of a major competitor's power to determine its prices and output. It is precisely the loss of this power that makes a section 1 conspiracy so pernicious. *See* 15 U.S.C. § 1 (1982). For this reason, a member of a section 1 conspiracy has standing to challenge the restraint upon its freedom to compete, even though, in the long run, it may enjoy the benefits of the cartel. *See Volvo North America Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 67 (2d Cir.1988); *cf. Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 137–40, 88 S.Ct. 1981, 1983–85, 20 L.Ed.2d 982 (1968) (standing upheld for franchisee despite participation in unreasonably restrictive franchise agreement).

It is possible, of course, that Gold Fields, if it remains a distinct corporation within the enlarged Minorco combination, will ultimately derive some economic benefit from the enhanced power of its corporate parent. But Gold Fields is entitled to prefer to take its chances on its capacity to prosper as an independent entity. Whether in the long run more profits will enter its corporate treasury as an independent company than as a subsidiary of Minorco is a speculative matter that need not concern us. The antitrust laws ensure the right to compete.

---

5. The dissenting opinion of Judge Altimari points out that the injury complained of by Gold Fields would occur even if the total market share of the combining corporations were only two per cent. If suit were brought on such insubstantial facts, the target would still have standing *to claim* that it was injured by a section 7 violation, but it would lose *on the merits*, probably for failure to state a claim and surely on summary judgment. A litigant need not have a winning claim to have standing.

That is what Gold Fields wishes to do, and that is what it will not be able to do if the threatened takeover succeeds.

■ Nor is it any of our concern whether the motivation for Gold Fields' suit is to protect competition or the job security of its senior management. We recognize that for a variety of reasons target companies may try to find refuge in the antitrust laws to fend off unwanted suitors, *see Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 854 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). But whether Gold Fields has standing turns on whether what it is about to lose is an injury of the type the antitrust laws were intended to prevent, not on why Gold Fields has decided to complain of this injury.

In granting standing to Gold Fields and GFMC, we rely on our pre-*Cargill* decision in *Grumman Corp. v. LTV Corp.,* 665 F.2d 10 (2d Cir.1981). In that case, Grumman sought injunctive relief to prevent an unwanted suitor from executing a tender offer for all of Grumman's shares. We affirmed the grant of a preliminary injunction, noting:

> If the effect of a proposed takeover may be substantially to lessen competition, the target company is entitled to fend off its suitor.
>
> . . . .
>
> If free to combine, two competitors might be expected to prefer the advan-

tages of diminished competition. But in reality it is only the resulting entity that would enjoy such advantages. The target company is entitled under § 16 to preserve its separate existence as a competitor.

*Id.* at 11, 16 (citation omitted). A number of other courts have granted standing to targets and have either explicitly or implicitly endorsed the *Grumman* analysis. *See Marathon Oil Co. v. Mobil Corp.,* 669 F.2d 378, 383–84 (6th Cir.1981), *cert. denied,* 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Laidlaw Acquisition Corp. v. Mayflower Group,* 636 F.Supp. 1513, 1517–19 (S.D.Ind.1986); *Gearhart Industries, Inc. v. Smith International, Inc.,* 592 F.Supp. 203, 211 n. 1 (N.D.Tex.1984), *modified on other grounds,* 741 F.2d 707 (5th Cir.1984); *Arnett v. Gerber Scientific,* 566 F.Supp. 1270, 1274 (S.D.N.Y.1983); *Whittaker Corp. v. Edgar,* 535 F.Supp. 933, 950 (N.D. Ill.1982).

The District Court acknowledged the *Grumman* analysis but held that *Cargill* had weakened *Grumman*'s precedential value. In particular, the District Court noted that in *Grumman* we had acknowledged the view that "the inquiry in a suit under § 16 is not as narrowly focused as in a suit for damages under § 4." 665 F.2d at 16 n. 4. *Cargill* emphasized that antitrust injury is an element of suits under both sections 16 and 4, though the Court acknowledged some differences in the standing analysis under these provisions.[6]

6. Although the Supreme Court requires a showing of "antitrust injury" in both injunction and damage cases, it has specifically said that "standing analysis under § 16 will not always be identical to standing analysis under § 4." *Cargill v. Monfort of Colorado, Inc., supra,* 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6. Since section 4 allows for treble-damage recovery, courts will generally be more circumspect about granting relief: "In order to protect against multiple lawsuits and duplicative recoveries, courts should examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under § 4." *Id.; see also Associated General Contractors of California, Inc. v. Carpenters,* 459 U.S. 519, 544–45, 103 S.Ct. 897, 911–12, 74 L.Ed.2d 723 (1983). Conversely, since relief is equitable under sec-

tion 16 and "'one injunction is as effective as 100,'" *Cargill v. Monfort of Colorado, Inc., supra,* 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6 (quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 261, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972)), these other factors relevant to section 4 standing analysis "are not relevant under § 16." *Id.* Thus *Cargill* supports the proposition that standing analysis under section 16 is still less rigorous than that under section 4. We therefore do not read *Cargill* to have weakened the Court's prior holding that section 16 is imbued with a special public policy dimension:

> Section 16 should be construed and applied with this purpose [enforcing the antitrust laws] in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as be-

As indicated above, however, we believe that the injury of which Gold Fields complains is antitrust injury. Moreover, the denial of standing to the plaintiff in *Cargill* does not require a similar result here. In *Cargill,* a competitor claimed that it stood to lose profits as a result of *increased* competition from merging rivals. The Supreme Court held that the antitrust laws did not protect Cargill from increased competition in the absence of evidence of predatory pricing. Our case involves a threat of *decreased* competition and threatens a target with elimination as an independent competitor.

We note finally that if we fail to recognize target standing, we would substantially impair enforcement of the antitrust laws to protect against anticompetitive takeovers. The government, with its limited resources, cannot be relied upon as the sole initiator of enforcement actions. That is why Congress authorized private enforcement of the antitrust laws. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130–31, 89 S.Ct. 1562, 1580–81, 23 L.Ed.2d 129 (1969); *Perma Life Mufflers, Inc. v. International Parts Corp., supra,* 392 U.S. at 139, 88 S.Ct. at 1984 ("[T]he purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws."); *see also* Note, *Antitrust Standing of Target Corporations to Enjoin Hostile Takeovers Under Section 16 of the Clayton Act,* 55 Fordham L.Rev. 1039, 1056 (1987). But private enforcement depends on the willingness of affected companies to enter the fray and risk substantial money, time, and effort in lawsuits that have even more uncertainty of outcome than ordinary litigation. In the enforcement of section 7's proscription against anticompetitive acquisitions, non-target competitors claiming standing face the substantial barriers of proof erected by *Cargill.* Consumers are unlikely to face the prospect of suffering a sufficient amount of damage to justify the cost of seeking a pre-acquisition injunction. The target of a proposed takeover has the most immediate interest in preserving its independence as a competitor in the market.

For all these reasons, we hold that Gold Fields and GFMC have standing, along with Newmont and Newmont Gold, to seek relief under section 16.

We now turn to the District Court's principal factual findings concerning the plaintiffs' probability of success on the merits. We may reject those factual findings only if they are clearly erroneous. See *McNeilab, Inc. v. American Home Products Corp.,* 848 F.2d 34, 37 (2d Cir.1988).

b. *Relevant Market.* In determining whether a horizontal merger violates section 7, a court must identify the relevant market in which the merger threatens to lessen competition. *See United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963). The District Court determined that the relevant market included all noncommunist gold mining, except for scrap and official government resources. A post-acquisition Minorco would give Anglo and the Oppenheimer family control of 32.3% of that market. That percentage is above the 30% held by the Supreme Court to trigger a presumption of illegality in *Philadelphia Nat'l Bank.* It is certainly sufficient to satisfy appellees' burden of showing likelihood of success on the merits.

■ Appellants urge a broader relevant market that includes scrap gold and eastern bloc gold resources. They argue that gold from these sources is freely interchangeable with newly mined western gold. As they put it, gold is gold. While this argument has an attractive simplicity, we cannot say that the District Court erred in

---

tween competing private claims." *Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944). Its availability should be "conditioned by the necessities of the public interest which Congress has sought to protect." *Id.,* at 330, 64 S.Ct. at 592.

*Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).

declining to accept it at this stage of the litigation. Judge Mukasey confined the relevant market to western world production on the basis of an accepted economic benchmark for identifying substitute goods within a given market; under that benchmark, sales of a "substitute" rise significantly in response to a non-temporary increase of 5% or more in prices of the primary product. Only noncommunist gold supplies, excluding scrap, satisfied this benchmark. There was evidence that sales of eastern bloc gold did not increase when the price of western gold rose. Applying the clearly erroneous standard, we accept the District Court's determination of the relevant market for purposes of the preliminary injunction.

■ c. *Attribution of Market Share to Minorco.* Minorco also contends that the District Court erred in attributing to Minorco the power of the Oppenheimer family and Anglo in the gold market. Appellant contends that there was no evidence that Minorco was dominated or controlled by outside entities and that the District Court should have respected Minorco's separate corporate existence. Despite appellant's assertions, we think the evidence in the record adequately supports Judge Mukasey's conclusion that the intertwined relationships among Anglo, De Beers, Minorco, and the Oppenheimer family warrant attribution of aggregate market power to Minorco.

Applying our deferential standard of review to Judge Mukasey's findings of fact and conclusions of law, we find that all four plaintiffs have demonstrated a likelihood of success on the merits of their section 7 claim for section 16 relief.

■ 2. *Irreparable Harm.* The four plaintiffs have also demonstrated a threat of irreparable harm sufficient to satisfy the second half of the preliminary injunction standard. Were the merger to be consummated, the Minorco group will likely dominate the strategically important world gold market. Gold Fields and its associated entities would cease to be viable competitors in the market. Such a possibility alone suggests that "doubts as to whether a [pre-

liminary] injunction … is necessary to safeguard [the target group] … should be resolved in favor of granting the injunction." *Gulf & Western Industries v. Great Atlantic & Pacific Tea Co.,* 476 F.2d 687, 699 (2d Cir.1973). As we observed in *Grumman,* "[I]rreparable damage exists here because of the high probability that [the target and its subsidiaries] will cease to be an effective competitor in … markets of vital interest to the nation's economy and defense." *Grumman Corp. v. LTV Corp., supra,* 665 F.2d at 16. Erring on the side of granting the injunction becomes especially imperative in corporate control contests because "once the tender offer has been consummated it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'" *Sonesta Int'l Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir.1973): *see also Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir.1969). A preliminary injunction is therefore the remedy of choice for preventing an unlawful merger. *See Piper v. Chris Craft Industries, Inc.,* 430 U.S. 1, 42, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977). Since it will be well nigh impossible for the District Court to undo the takeover after the fact, we cannot say that Judge Mukasey exceeded his discretion in determining that the harm threatened here was irreparable.

## II. The Fraud Claims

On the cross-appeal, Gold Fields alleges that Minorco violated the anti-fraud provisions of the securities laws by making false and misleading statements about the extent to which Minorco is controlled by South African corporations and individuals. Gold Fields shareholders would want to be aware of these South African ties because, according to cross-appellant, such associations would make it difficult for Gold Fields to continue business operations in certain countries.

The anti-fraud laws of the United States may be given extraterritorial reach whenever a predominantly foreign transaction has substantial effects within the United

States. *See Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir.), *reh'g on other grounds*, 405 F.2d 215 (in banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Restatement (Third) of the Foreign Relations Law of the United States* § 402(1)(c) (1987) [hereinafter "Third Restatement"]. In determining whether certain effects qualify as "substantial," courts have been reluctant to apply our laws to transactions that have only remote and indirect effects in the United States, since "it would be ... erroneous to assume that the legislature always means to go to the full extent permitted" by a literal reading of the anti-fraud laws. *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir. 1972). As Judge Friendly observed: "When, as here, a court is confronted with transactions that on any view are predominantly foreign, it must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

In applying the so-called "effects" test enunciated in *Schoenbaum*, the District Court determined that the number of Americans holding stock in the allegedly defrauded British company was "insignificant" and that Minorco had taken "whatever steps it could to assure that the tender offer documents would not reach Gold Fields ADR holders." 698 F.Supp. 487 (S.D.N.Y.1989). Because Minorco had sent the offering documents to British nominees of American shareholders, the District Court concluded that the transaction between Minorco and Gold Fields had only indirect effects on a relatively small number of Americans. However, the District Court's analysis cannot be reconciled with this Court's prior holding in *Bersch*. In that case, purchasers of common stock of I.O.S., Ltd., a Bahamian corporation, brought a class action for damages, alleging that fraudulent financial statements were included in prospectuses that were used in offerings of 3.95 million shares of I.O.S. stock. The prospectus stated that the shares were not being offered in the United States. Nevertheless, at least 22 United States residents purchased 41,936 shares. Although the record did not indicate how the Americans came to purchase the shares, Judge Friendly assumed that the allegedly misleading documents must have been sent into the United States, and he asserted subject matter jurisdiction on the basis of that assumption. *Bersch v. Drexel Firestone, Inc., supra*, 519 F.2d at 991.

▮ In this case, the District Court should have asserted jurisdiction once it noted that Minorco knew that the British nominees were required by law to forward the tender offer documents to Gold Fields' shareholders and ADR depository banks in the United States. This "effect" (the transmittal of the documents by the nominees) was clearly a direct and foreseeable result of the conduct outside the territory of the United States. *Third Restatesent, supra*, § 402(1)(c). If in *Bersch* we could say that Congress intended American antifraud laws to apply to a transaction involving 41,936 shares owned by 22 American residents, then surely we must come to the same conclusion here, where American residents representing 2.5% of Gold Fields' shareholders owned 5.3 million shares with a market value of about $120 million.

In rejecting subject matter jurisdiction, the District Court relied on *Plessey Co. PLC v. General Electric Co. PLC*, 628 F.Supp. 477 (D.Del.1986), and *IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir.1975). Both are inapposite. In *Plessey*, the target company sought to compel the bidder to make certain filings with the Securities and Exchange Commission (SEC) under the Williams Act, Pub.L. No. 90–439, 82 Stat. 454 (1968) (codified at 15 U.S.C. §§ 78m(d), (e), 78n(d)–(f) (1982)). No allegations of fraud were made. As we observed in *Bersch*, however, the antifraud provisions of American securities laws have broader extraterritorial reach than American filing requirements. 519 F.2d at 986; *see also Third Restatement, supra*, § 416 comment

a ("[A]n interest in punishing fraudulent or manipulative conduct is entitled to greater weight than are routine administrative requirements."), reporters' note 2.

*Vencap* is also distinguishable. There, a foreign investment trust sued a corporation and individuals for selling allegedly fraudulent securities to the trust. Only .2% of the trust's fundholders—about 300 investors—were United States citizens and residents. It was unknown how Americans came to invest in the trust since "the shares of [the trust] apparently were not intended to be offered to American residents or citizens...." *IIT v. Vancap, Ltd., supra,* 519 F.2d at 1017. Judge Friendly, writing for the Court in *Vencap,* as he did in *Bersch,* concluded that jurisdiction was lacking because the foreign trust was the only party defrauded: "In contrast to Bersch ... this day decided, the fraud was practiced not on individual Americans who purchased securities but on the trust in which they had invested.... We cannot believe that Congress would have intended the anti-fraud provisions of the securities laws to apply if [defendant] had defrauded a British investment trust by selling foreign securities to it simply because half of one per cent of its assets was held by Americans." *Id.* at 1016–17. Thus, it was the trust that held the fraudulent securities, not the American investors in the trust. Our case clearly resembles *Bersch* more closely than *Vencap,* since the American shareholders in Gold Fields ADR's hold direct interests in the allegedly defrauded company. We therefore conclude that the District Court should have exercised subject matter jurisdiction over plaintiffs' fraud claims.

The SEC, which filed a brief as *amicus curiae* supporting subject matter jurisdiction over the fraud claims, nevertheless urges us to direct the District Court to abstain from granting a remedy for reasons of international comity. We decline this suggestion and instead remand the fraud claims to the District Court for further proceedings. It is a settled principle of international and our domestic law that a court may abstain from exercising enforcement jurisdiction when the extraterritorial effect of a particular remedy is so disproportionate to harm within the United States as to offend principles of comity. *See Third Restatement, supra,* § 431; *cf. Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir.1979); *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir.1976). *But cf. Laker Airways v. Sabena, Belgian World Airlines,* 731 F.2d 909 (D.C.Cir.1984). In determining whether a particular enforcement measure is "reasonably related to the laws or regulations to which they are directed," *Third Restatement, supra,* § 431(2), the American court may take note, for example, of "connections ... between the regulating state and the person principally responsible for the activity to be regulated" as well as "the extent to which another state may have an interest in regulating the activity." *Id.* § 403(2)(b), (g). We decline to conduct this inquiry, however, because the record in the District Court is insufficiently developed for us to determine whether plaintiffs' requested remedy for the fraud violations—corrective disclosure of Minorco's ties to South African interests—is warranted. Now that we have determined that the District Court has jurisdiction over the fraud claims, Judge Mukasey should proceed to the merits and, if plaintiffs prevail, conduct additional fact-finding to determine whether an appropriate remedy, consistent with comity principles, may be fashioned in this case.

### Conclusion

The order of the District Court granting a preliminary injunction is affirmed; the rulings denying antitrust standing to Gold Fields and GFMC and rejecting subject matter jurisdiction over the securities laws claims are reversed; and the case is remanded for proceedings consistent with this opinion.

ALTIMARI, Circuit Judge, concurring in part and dissenting in part:

I concur in the well-reasoned opinion of the majority except as it relates to target standing. Today the court grants a takeover target standing to challenge its takeover as a violation of the antitrust laws.

In so doing, the majority expressly relies on *Grumman Corp. v. LTV Corp.*, 665 F.2d 10 (2d Cir.1981). Because *Grumman* is of limited vitality following the Supreme Court's decision in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), and because the takeover target has failed to show "antitrust injury," I respectfully dissent from the grant of standing to Consolidated Gold Fields PLC ("Gold Fields").

In *Cargill*, the Supreme Court determined that in order to obtain injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26 (1982), "a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" 479 U.S. at 113, 107 S.Ct. at 491 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). By itself, an allegation of "injury causally linked to an illegal presence in the market" is insufficient to show "antitrust injury." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. A private plaintiff must also show "that his own injury coincides with the public detriment tending to result from the alleged violation." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 334.2b, at 305 (Supp.1988); *see Brunswick*, 429 U.S. at 487–89, 97 S.Ct. at 696–98; *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1333–34 (7th Cir.1986).

Gold Fields asserts that if the takeover is completed it will lose its power of independent decision-making as to price and output, and its ability to compete independently in the market. These injuries, however, "do[ ] not result from the possibility of substantially lessened competition, but rather derive[ ] from the fact that after a successful, albeit unfriendly, merger, two corporate entities become one." *Carter Hawley Hale Stores, Inc. v. The Limited, Inc.*, 587 F.Supp. 246, 250 (C.D.Cal.1984); *see also Burlington Indus., Inc. v. Edelman*, 666 F.Supp. 799, 805 (M.D.N.C.1987). For example, each of the injuries alleged by Gold Fields would occur if the combining corporations controlled a total market share of only 2%, or if the entity attempting the takeover was not a competitor of the target. By definition, when two corporations merge there is a loss of independence. Clearly, the loss of independence which occurs in every merger is not the type of loss that the "antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. Thus, although Gold Fields' loss might be "causally linked to an illegal presence in the market," *id.*, Gold Fields has not shown antitrust injury because its loss did not "flow[ ] from that which makes defendants' acts unlawful." *Cargill*, 479 U.S. at 113, 107 S.Ct. at 491 (quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697).

I disagree with the majority's contention that target standing is compelled by our decision to allow a target to challenge its takeover in *Grumman*. In that case we did not consider, nor were we required to at the time, whether the injury asserted by the target was "antitrust injury" as defined in *Brunswick*. Similarly, each of the cases to which the majority cites as "endorse[ment]" of the *Grumman* analysis" were decided prior to *Cargill* and also did not consider whether the target suffered "antitrust injury." *See Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 383–84 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F.Supp. 1513, 1517–19 (S.D.Ind. 1986); *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 592 F.Supp. 203, 211 n. 1 (N.D. Tex.1984), *modified on other grounds*, 741 F.2d 707 (5th Cir.1984); *Arnett v. Gerber Scientific, Inc.*, 566 F.Supp. 1270, 1274 (S.D.N.Y.1983); *Whittaker Corp. v. Edgar*, 535 F.Supp. 933, 950 (N.D.Ill.1982). In contrast, post-*Cargill* courts which have considered takeover target standing have explicitly or implicitly rejected *Grumman*, and have denied standing to the targets. *See Burnup & Sims, Inc. v. Posner*, 688 F.Supp. 1532, 1534–35 (S.D.Fla.1988); *Burlington*, 666 F.Supp. at 804–06. Denial of target standing is further supported by a substantial number of pre-*Cargill* cases, *see Central Nat'l Bank v. Rainbolt*, 720

F.2d 1183, 1187 (10th Cir.1983); *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir.1980); *Carter Hawley Hale Stores*, 587 F.Supp. at 248–50; *see also H.H. Robertson Co. v. Guardian Indus. Corp.*, 50 Antitrust & Trade Reg.Rep. (BNA) 166, 169–71 (3d Cir.), *vacated pending hearing in banc*, No. 85–3232 (3d Cir. 1986), and by scholarly commentary. *See, e.g.*, P. Areeda & H. Hovenkamp, *supra*, ¶ 340.2i, at 368–70; Easterbrook & Fischel, *Antitrust Suits by Targets of Tender Offers*, 80 Mich.L.Rev. 1155 (1982). Accordingly, I believe that the majority's reliance on *Grumman* and its *per se* rule that takeover targets have standing to assert section 16 claims to prevent their takeover is unwarranted.

Moreover, I am unpersuaded by the policy rationale advanced by the majority in support of target standing. The majority asserts that "if we fail to recognize target standing, we would substantially impair enforcement of the antitrust laws to protect against anticompetitive takeovers." The majority believes this to be so because consumers are unlikely to bring suit, and "non-target competitors claiming standing face the substantial barriers of proof erected by *Cargill*." However high the barriers, they must also be faced by target competitors. We cannot lessen the burden for one type of plaintiff merely because other potential plaintiffs are also burdened. Although the barriers may be substantial, competitors are not foreclosed from bringing suit under section 16, *see Cargill*, 479 U.S. at 121, 107 S.Ct. at 495, and they can obtain standing when they show antitrust injury. *See R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir.1989).

Accordingly, I would affirm the district court's denial of standing to Gold Fields. In all other respects, I agree with the majority opinion.