**STATE OF NEW YORK, Plaintiff,**

v.

**KRAFT GENERAL FOODS, INC., Nabisco Cereals, Inc., Nabisco, Inc., Philip Morris Companies Inc., RJR Nabisco Holdings Corp. and RJR Nabisco Inc., Defendants.**

No. 93 Civ. 811(KMW).

United States District Court,
S.D. New York.

June 14, 1993.

Gary Malone, Asst. Atty. Gen. and Oliver Koppell Atty. Gen., New York City, for plaintiff.

Abe Krash, Arnold & Porter, Washington, DC, for Kraft.

Richard C. Weisberg, Simpson, Thacher & Bartlett, New York City, for Nabisco and RJR Nabisco.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

### Background

On February 10, 1993 the State of New York ("the State") sued Kraft General Foods, Inc. ("Kraft") and RJR Nabisco Holdings Corp. ("Nabisco"), attacking Kraft's acquisition of Nabisco's ready-to-eat ("RTE") cereal assets (the "Acquisition"). The State also seeks either to rescind the transaction or to divest Kraft of Nabisco's RTE cereal assets. The State claims that the Acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18; Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; and Section 340 of New York's Donnelly Act, N.Y.Gen.Bus.L. § 340.

Pending a final determination, the State sought to preliminarily enjoin Kraft from taking any action that would alter the status quo as of November 11, 1992, with respect to the RTE cereal assets purchased from Nabisco and any assets currently used by Nabisco for the production of RTE cereals. The order sought by the State would bar Kraft from altering the trade dress of the former Nabisco brands so that Kraft would be required to sell the newly acquired RTE cereals under the Nabisco trademark and trade dress pending the outcome of trial.

The court denied the motion for a preliminary injunction at the conclusion of a hearing conducted on May 5, 1993. The following constitutes the court's factual findings and conclusions of law with respect to plaintiff's motion, and supplements the court's May 5, 1993 oral ruling.

## I. The RTE Cereal Industry

Sales of RTE cereals in 1991 totalled more than $7 billion. First Cotterill Aff. ¶ 8. Before and after Kraft acquired Nabisco's RTE cereal assets, Kraft was the third largest RTE cereal producer in the United States. Kraft sells RTE cereals under the "Post" trademark, including Grape Nuts, Raisin Bran, Honeycomb, Pebbles, Honey Bunches of Oats, Alphabits and Cocoa Pebbles.

Prior to Nabisco's exit from the RTE cereal business after almost half a century, Nabisco was the sixth largest RTE cereal producer, making such products as Big Biscuit Shredded Wheat, Spoon Size Shredded Wheat, Shredded Wheat 'N Bran, Shredded Wheat with Oat Bran (collectively "Shredded Wheat"), 100% Bran, Frosted Wheat Squares, various Fruit Wheats and Team Flakes. Krash May 21, 1993 Letter, Schedule 1.1C. From 1988 to 1992, Nabisco adopted a short-term, profit maximization strategy of raising prices well above the industry average[1] and reducing marketing support for its RTE cereal products by 70%. First Cotterill Aff. ¶ 30. Nabisco also did not introduce any new brands. The result of this strategy was a steady erosion in Nabisco's market share from 5.52% percent in 1988 to 2.94% in 1992. By April 1, 1992, Nabisco's core brands, Spoon Size Shredded Wheat and Big Biscuit Shredded Wheat, were in danger of being dropped from trade accounts if market share declined any further, because

[1] In 1988, Nabisco priced its Shredded Wheat products at 93% of the industry average. By 1992, the per pound price of $3.13 was 106% of the industry average. Hrg. Tr. at 97.

their sales volume would not have justified their shelf space. Thomas Aff. ¶ 3.[2] Such delisting occurred with respect to Nabisco's Frosted Wheat Squares, Fruit Wheats and Team Flakes, whose market share of less than 1% each led to their distribution in only limited geographic markets. *Id.*

Prior to the Acquisition, the United States market for RTE cereal sales in 1992 was shared by six major companies and private label and other firms as follows:

| | |
|---|---|
| Kellogg | 37.03% |
| General Mills | 25.58 |
| **Kraft/Post** | **11.79** |
| Quaker | 7.13 |
| Ralston | 4.63 |
| **Nabisco** | **2.94** |
| Private Label & Other | 10.90 |

Following the Acquisition, Kraft remained in third place, increasing its market share to 14.73%. Cotterill Reply Aff. Ex. A.

## II. *The Acquisition*

In the Spring of 1992, Nabisco decided to leave the cereal business. Thomas Aff. ¶ 2; Marram Aff. ¶ 7. Nabisco initially agreed to sell its cereal assets to General Mills, the second largest RTE cereal seller (in terms of market share); that transaction was abandoned on November 3, 1992. Weisberg Aff. ¶¶ 2–6; Thomas Aff. ¶ 2. According to plaintiff, the sale to General Mills was abandoned due to antitrust concerns raised by the Federal Trade Commission ("FTC") and the New York Attorney General. Pl.Mem.Supp. at 8 n. 15.

On November 12, 1992 Nabisco agreed to sell its U.S. and Canadian cereal assets to Kraft for $450 million. Of the total acquisition price, $388 million was allocated to the assets in the United States and $62 million was allocated to the Canadian assets. Hinkes Aff. ¶ 32. Roughly three quarters of the total $450 million acquisition price was allocated to the good will associated with the Nabisco Shredded Wheat brand identity. Hinkes Aff. ¶ 15. Under the terms of the Acquisition

1. Kraft acquired for four years the exclusive and non-assignable right to use the "Nabisco" trademarks on the Nabisco cereals;

2. Kraft acquired Nabisco's Naperville, Illinois plant;

3. Nabisco agreed to supply Kraft with as much RTE cereal product as Kraft requires from the Nabisco plant in Niagara Falls, New York for at least five years;

4. Nabisco agreed not to compete in the RTE cereal market for 15 years, and not to compete with a shredded wheat product for 25 years; and

5. Kraft agreed not to compete in the "Triscuit-type product" market for 15 years.

## II. *Review by the FTC and New York Attorney General*

On November 18, 1992, Nabisco and Kraft notified the FTC and the Antitrust Division of the U.S. Department of Justice of their intent to consummate the transaction, in accordance with the terms of the Hart–Scott–Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a *et seq.* Kraft and Nabisco provided the FTC's lawyers and economists with documents and information about the transaction. The New York State Attorney General's Office received copies of the documents supplied by the defendants to the federal authorities in early December 1992 pursuant to the information sharing protocol between state and federal authorities. *See Program for Federal–State Cooperation in Merger Enforcement,* 4 *Trade Reg.Rep.* (CCH) ¶ 13,212 (May 27, 1992).

On December 15, 1992, the New York Attorney General's office asked defendants to produce additional information not requested by, and not produced to, the FTC. The additional information requested by the State centered on the price/cost ratios of defendants' RTE cereal brands over the past five years. Sampson Aff. ¶ 10. On December 23, 1992 Kraft responded in part to the State's information request; the State issued a further request that same day. *Id.* ¶ 8.

---

**2.** As of April 1, 1992, the market share of Spoon Size Shredded Wheat and Big Biscuit Shredded Wheat was 1.1% and 0.7%, respectively. Thomas Aff. ¶ 2.

On December 24, 1992, the Hart–Scott–Rodino waiting period expired. The FTC took no action with respect to the proposed asset sale, presumably finding insufficient reason to seek additional information or to sue to enjoin the transaction.

On December 30, 1992, Kraft responded in part to the State's December 23, 1992 information request. On January 4, 1993, defendants consummated the asset sale. On January 11, 1993, Nabisco responded to the State's December 23, 1992 information request and completed its response to the State's December 15, 1993 information request. On January 22, 1993, Kraft completed its response to the State's December 23, 1992 request.

Since the end of January 1993, Nabisco's RTE cereal operations have been thoroughly integrated with Kraft's operations with respect to production, marketing, pricing and promotion. Hinkes Aff. ¶¶ 24–30; Marram Aff. ¶¶ 2–3. On January 6, 1993 Kraft notified Nabisco's brokers, who distributed Nabisco's products to the retail trade, that they would be terminated as of February 12, 1993 and replaced with Kraft's sales force. Hinkes Aff. ¶ 26. All of Nabisco's former salaried employees who were hired by Kraft are now participating in Kraft's benefit plans. The union contracts covering hourly employees at the Naperville plant were assigned to Kraft, which has assumed responsibility for the management of the hourly employees' benefit plans. *Id.* ¶ 28.

As of January 25, 1993, Nabisco dissolved its RTE cereal marketing department. One member of Nabisco's former marketing staff joined Kraft; the others transferred to various positions within Nabisco or left the company entirely. Marram Aff. ¶ 3. To date, Kraft has marketed the Nabisco cereal lines using only the Nabisco trademark under the four year license. May 18, 1993 Tr. at 5.

On February 10, 1993 the State commenced this action and moved for a preliminary injunction.

## Discussion

I.  *Standard for Preliminary Injunctive Relief*

Under Section 16 of the Clayton Act, a private plaintiff is entitled to injunctive relief against loss or damage threatened by a violation of Section 7 under general equitable principles and upon "a showing that the danger of irreparable loss or damage is immediate...." 15 U.S.C. § 26 (West's Supp.1993). *See also R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107 (2d Cir.), *cert. denied sub nom. Thomas J. Lipton, Inc. v. R.C. Bigelow, Inc.,* 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). Section 7 of the Clayton Act prohibits the acquisition of the assets of another corporation "where in any line of commerce ... in any section of the country, the effect of such acquisition may be substantially to lessen competition...." 15 U.S.C. § 18 (West's Supp.1993).

■ The State of New York sues as *parens patriae* on behalf of the citizens of New York. Although the State of New York is a governmental actor, it is considered a private party when seeking an injunction pursuant to the Clayton Act. *See California v. American Stores Co.,* 495 U.S. 271, 295, 110 S.Ct. 1853, 1867, 109 L.Ed.2d 240 (1990). The State, therefore, does not benefit from the presumption of irreparable harm enjoyed by the FTC or the Department of Justice when those agencies sue to stop a merger. *See FTC v. University Health, Inc.,* 938 F.2d 1206, 1218 (11th Cir.1991). Therefore, to obtain preliminary injunctive relief, the State must establish "(1) irreparable harm *and* (2) either (a) likelihood of success on the merits *or* (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Consolidated Gold Fields, PLC v. Minorco, S.A.,* 871 F.2d 252, 256 (2d Cir.) (citation omitted) (emphasis added), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989).

■ Because the State has failed to establish irreparable harm, the court must deny its motion. To obtain an injunction before the defendant has had an opportunity to conduct full discovery and put on its case at trial, the court must find that the plaintiff, or here the consumers of RTE cereal, will be irreparably harmed prior to the conclusion of

the trial of plaintiff's claims, which is scheduled for March 1, 1994. *See, e.g., Reuters, Ltd v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). The danger to competition "must be real, not fancied, actual not prospective, and threatened, not imagined." *Fein v. Security Banknote Co.,* 157 F.Supp. 146, 148 (S.D.N.Y.1957) (discussing criteria for injunctive relief under § 16).

## II. *Application of Standard for Injunctive Relief*

In this case, much of the conduct that is typically viewed as constituting potentially "irreparable harm" in the merger context either took place prior to the commencement of this action, or has been dealt with by stipulation. This case thus poses a very different problem from that posed in *Consolidated Gold Fields,* 871 F.2d at 261, where difficulties in undoing the transaction after the operations are combined militated in favor of enjoining the merger before it was consummated. One of the most drastic changes was completed before the preliminary injunction motion was filed: Nabisco's RTE cereal operations were fully integrated into Kraft's operations. Hinkes Aff. ¶¶ 24–30; Marram Aff. ¶¶ 2–4. In addition, by operation of law, Kraft was required to state on the cereal boxes that it is the manufacturer of the cereal; this information now appears in small type on the cereal boxes. May 18, 1993 Tr. at 5–6. Kraft stipulated that it would maintain the current status quo regarding the packaging of the former Nabisco products until December 31, 1993 *id.,* and that the only change that will occur during the first few months of 1994 is that the Post name will be added to the cereal boxes; it will appear there along with the prominently displayed Nabisco mark and logo. June 9, 1993 Tr. at 3–5. The conduct sought to be enjoined at this stage is thus fairly finite: between January 1, 1994 and March 1994, when this case is due to be tried, Kraft expects to begin test marketing slightly altered cereal boxes, that will bear the Post logo along with the Nabisco logo.

The State ultimately seeks either (1) to rescind the Acquisition and to require Nabisco to return to the RTE cereal business[3] June 9, 1993 Tr. at 13, or (2) to divest Kraft of the former Nabisco assets by selling them to a new entrant and to order Nabisco, over any objections it may have, to license this new entrant to use the Nabisco trademark on the former Nabisco cereals.[4] *Id.* at 12–13; Hrg. Tr. at 246–47. The State asserts that the brand identity and good will associated with the former Nabisco brands represent an important source of competition in the RTE cereal industry. Pl. Reply Mem. at 29. The State's purpose in seeking to preserve the value of the Nabisco mark is to enable either Nabisco or a third party to capitalize on the good will Nabisco built up over many years. The court now considers what detrimental effect, if any, the actions contemplated by Kraft will have on the Nabisco mark on RTE cereals.

The State does not counter Kraft's assertion that Post is a good name in the cereal business and that mere association with the Post name will not devalue the Nabisco name or the products. June 9, 1993 Tr. at 9, 11.[5]

3. A court should not order rescission unless the seller's return to the industry is feasible under the circumstances and the remedy is the most effective way to cure the antitrust violation. *See generally,* Earl W. Kintner, 5 *Federal Antitrust Law,* § 40.8 at 121, § 40.14 at 156–57 (1984 & Supp.1993).

4. A court may be reluctant to order this latter relief, given that Nabisco continues to use the Nabisco name and trademark to sell over $3 billion worth of cookies and crackers each year. Thomas Aff. ¶ 4; Hrg. Tr. at 246.

5. As the Business Director for Nabisco's RTE cereal business put it, Post is "in the long run, a better brand umbrella for RTE cereal products than 'Nabisco,' which most consumers identify primarily with cookies and crackers." Thomas Aff. ¶ 7. The State concedes that Kraft will maintain the high quality of Shredded Wheat. Further, since acquiring Nabisco's RTE cereal assets, Kraft has increased marketing above Nabisco's low levels, and lowered the price of Shredded Wheat relative to competitive cereals. Hrg. Tr. at 72–73, 76, 101. Thus, association with Post may enhance the value of the former Nabisco cereals.

The State argues that courts have upheld trademark infringement claims where the infringer has a stronger reputation than the trademark holder, despite the "apparent lack of injury to [the trademark holder's] reputation," *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486,

New York State nevertheless contends that consumers of these products will suffer irreparable harm from the addition of the Post logo, because consumers will be confused by (1) the simultaneous association of two brands with a product, and (2) a later uncoupling of the brands if the court orders divestiture. Sampson June 10, 1993 Letter at 3–7.[6] The State asserts that Kraft's conduct will diminish the demand for these Nabisco products and will diminish the value of the Nabisco mark as used on formerly Nabisco cereals. Cotterill Reply Aff. ¶ 48. As the State puts it, Kraft's placing its own trademark on the products, either with the Nabisco trademark or by itself, "will place the integrity of that brand identity, and consequently the availability of any effective relief in this action, in jeopardy." Pl. Reply Mem. at 29.

The State offers little evidence that the small change contemplated by Kraft, in test markets, over a two-to-three month period, will diminish the value of the Nabisco mark on cereals. The State's expert opines that once the changeover from Nabisco to Post begins, "it would be at best extremely difficult for any other firm to obtain consumer acceptance of yet another switch in the trademark and firm name under which Shredded Wheat products are sold." Cotterill Reply Aff. ¶ 48. He asserts that confusion, and therefore, an erosion of brand loyalty, will ensue, but offers no further support for that statement. *Id.*

Thus, the Court is left with the State's largely unsupported contention that the addition of the Post name will diminish the value of the Nabisco mark and product, simply because consumers will find that change confusing, when coupled with any post-divestiture change in mark. The Court views that contention as too speculative to support a finding of irreparable harm.

Because plaintiff has failed to show irreparable injury, the "single most important prerequisite" to the issuance of an interlocutory injunction, *Reuters, Ltd.,* 903 F.2d at 907, the court need not reach the issue of State's likelihood of success on the merits. The court denies the motion for a preliminary injunction. If the State wishes to present additional evidence of the likelihood of consumer confusion and consequent detriment to consumers from a weaker Shredded Wheat brand, if Kraft alters its stated plans with respect to the former Nabisco RTE cereals, or if trial is delayed, the court retains the power to reconsider the need for injunctive relief.

### Conclusion

For the reasons stated above, the court denies plaintiff's motion for a preliminary injunction.

SO ORDERED.

---

492 (2d Cir.1988). The State's reliance on trademark infringement cases involving competing products is unavailing here. Sampson June 10, 1993 Letter at 3–7. *Banff* is distinguishable because the concerns of trademark law are avoiding confusion as to the source of the goods in question and preserving fair competition. Here, there are no competing goods at issue. The sole question is whether the addition of the Post name on products manufactured by Kraft will cause Shredded Wheat consumers nationwide not to buy the hypothetical new entrant's products because the Nabisco name appears on the box with the Post name for several months in a few test markets.

6. The Court notes that the association with Kraft already exists on the cereal boxes by operation of law, in small type, and that the addition of the Post logo simply heightens the likelihood of a consumer becoming aware of that association. May 18, 1993 Tr. at 5–6.