**CARTER HAWLEY HALE STORES, INC., Plaintiff,**

v.

**The LIMITED, INC., et al., Defendants.**

**No. CV 84–2200 AWT.**

United States District Court,
C.D. California.

April 27, 1984.

William C. Pelster, New York City, James E. Lyons, Michael H. Diamond, Skadden, Arps, Slate, Meagher & Flom, William W. Vaughn, Robert C. Vanderet, O'Melveny & Myers, Los Angeles, Cal., for Carter Hawley Hale Stores, Inc.

Ronald L. Olson, Munger, Tolles & Rickershauser, Los Angeles, Cal., Peter D. McKenna, Wachtell, Lipton, Rosen & Katz, New York City, A. Douglas Melamed, Wilmer, Cutler & Pickering, Washington, D.C., for The Limited, Inc. and Leslie H. Wexner.

## MEMORANDUM DECISION AND ORDER

TASHIMA, District Judge.

On April 4, 1984, The Limited, Inc. ("Limited") commenced a cash tender offer to purchase 20.3 million shares of Carter Hawley Hale Stores, Inc. ("CHH") common stock, just over one-half of the shares then outstanding, at $30 per share (the "Offer"). The Offer was to expire at noon on May 1, 1984. Limited further stated its intention to exchange 1.32 shares of its common stock for each remaining outstanding share of CHH common stock if the initial tender offer is successful, in a second-step merger of the two companies.

Immediately after the Offer was announced on April 3, CHH commenced this action. In the Amended Complaint filed on April 6, CHH alleges that the Limited's intended acquisition of CHH will violate § 7 of the Clayton Act, 15 U.S.C. § 18, and that the Offer violates §§ 10(b), 14(d) and 14(e) of the Securities Exchange Act of 1934, as amended by the Williams Act (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(d), and 78n(e).

On April 16, 1984, CHH announced that it had entered into an agreement with General Cinema Corporation ("General Cinema") pursuant to which CHH sold 1 million shares of convertible preferred stock to General Cinema for $300 million. General Cinema agreed to vote its CHH preferred stock in accordance with the recommendation of CHH's Board of Directors, except in

certain specific circumstances. In addition, CHH granted General Cinema an option to buy CHH's Waldenbooks division for approximately $285 million. Its Board also authorized CHH to repurchase up to 15 million of its common shares in negotiated transactions and on the open market. On April 23, 1984, CHH authorized the repurchase of 3.5 million additional common shares, for a total of 18.5 million shares. By April 20, 1984, CHH had purchased approximately 13 million of its common shares and its total purchases now exceed 15 million shares.

On April 23, the Limited filed its First Amended Counterclaim against CHH, members of CHH's Board of Directors and General Cinema, seeking, *inter alia*, to enjoin CHH's defensive moves. The counterclaim alleges violations of the Exchange Act, the New York Stock Exchange Rules and breach of fiduciary duty and other corporate duties and obligations.[1]

Before the Court is CHH's application for a preliminary injunction enjoining the Limited and its Chairman and President, Leslie H. Wexner, from acquiring any securities of CHH pursuant to the Offer because the acquisition is violative of § 7 of the Clayton Act.[2]

## I. *Clayton Act Standing*

CHH alleges that the merger contemplated by the Offer violates § 7 of the Clayton Act because it may substantially lessen competition in the "moderate-price women's fashion apparel market" where CHH's Contempo Casuals division ("Contempo")

currently competes with Limited's Limited Stores division ("Limited Stores") and in the "special-sized women's apparel" market where certain of CHH's department store divisions compete with Limited's Lane Bryant division ("Lane Bryant").

█ In order to have standing to sue under the antitrust laws, a plaintiff must allege injury arising out of violation of *those* laws. In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1976), plaintiff bowling centers brought an antitrust action against a bowling equipment manufacturer and operator of bowling centers, claiming that defendant's acquisition of competing bowling centers that had defaulted in payments on bowling equipment purchased from defendant might substantially lessen competition in violation of § 7. Plaintiffs' theory was that had defendant allowed the defaulting centers to close, plaintiffs' profits would have increased. The Court of Appeals' holding that all plaintiff need demonstrate in order to pursue a § 7 claim was injury which was "causally related" to an illegal presence in the market, was rejected by the Court:

> Every merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons. But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects. Yet under the Court of Appeals' holding, once a

---

**1.** On April 17, Limited's application for a temporary restraining order, primarily to restrain CHH's repurchase of its own shares under its "open market purchase program," was denied. In light of Limited's announced intention to revise the Offer, as explained in footnote 2, below, Limited has withdrawn its application for a preliminary injunction, previously set for hearing together with CHH's application.

**2.** At the hearing on April 24, Limited announced that it was revising the Offer in light of CHH's defensive actions and an amendment to the Offer became effective on April 26 (the "Amended Offer"). Under the Amended Offer, the second-step exchange of shares will be eliminated and the revised offer appears, in effect, to be an

all-cash offer at an increased price of $35 per share. The Amended Offer appears to have mooted CHH's Exchange Act claims, at least insofar as any preliminary injunctive relief is concerned. For that reason, I address only the Clayton Act claim. Therefore, although the application for preliminary injunction is being denied, denial on the Exchange Act claims is without prejudice. Plaintiff may, if it can, show that *its* Exchange Act claims are not moot or that other claims exist with respect to the Amended Offer. Because the expiration date of the Amended Offer has been extended to May 9, this disposition of the Exchange Act claims will not prejudice plaintiff.

merger is found to violate § 7, all dislocations caused by the merger are actionable, regardless of whether those dislocations have anything to do with the reason the merger was condemned.

429 U.S. at 487, 97 S.Ct. at 696. The Court then went on to prescribe the basis for standing in § 7 actions:

Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). *See also Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 910, 74 L.Ed.2d 723 (1983); *General Cinema Corp. v. Buena Vista Distrib. Co.,* 681 F.2d 594, 596 (9th Cir.1982). Although *Brunswick* was an action for damages, its reasoning is equally applicable to injunctive actions. *Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205, 210–11 (3d Cir.1980).

The Ninth Circuit has yet to address the issue of whether a tender offer target has standing to challenge the acquisition on § 7 grounds. However, commentators have argued against standing in this context.

There is [a] class of merger victims whose interest is outside the protection of Clayton Act § 7: the target corporation resisting a takeover. To be sure, the target firm usually seeks injunctive relief ... but the interest asserted may seem questionable .... [A]n allegation of harm to the company may be inconsistent with the alleged antitrust violation. Every theory for condemning a ... merger implies a benefit for the acquired firm ... [but] antitrust interests are rarely involved.

II Areeda & Turner, *Antitrust Law* ¶ 346b at 248 (1978).

In *Central Nat'l Bank v. Rainbolt,* 720 F.2d 1183 (10th Cir.1983), the Tenth Circuit adopted similar reasoning to hold that a takeover target did not have standing to challenge the acquisition on antitrust grounds.

The [target] Bank alleges two sorts of anti-competitive injury. The first sort includes allegations of injury resulting from the possibility of being compelled to deal with various organizations controlled by [defendant]. The bank alleges that existing relationships that it has would be damaged and that it might incur additional costs in dealing with those organizations .... *[T]his sort of injury is not a result of diminution in competition but rather the effect of change in bank control.* We do not hold that no legally cognizable injury of the sort alleged could result from this acquisition. We merely hold that whatever injury of that sort may result, it does not come within the ambit of the antitrust laws.

The Bank also alleges a variety of anti-competitive effects including diminution in competition, heightened barriers to entry and price fixing. While these allegations do come within the purview of the antitrust laws, the Bank has no standing to raise them. The Clayton Act clearly provides that recovery thereunder is limited to those suffering anticompetitive injury.

720 F.2d at 1183 (emphasis added). *Cf. A.D.M. Corp. v. Sigma Instrument, Inc.,* 628 F.2d 753, 754 (1st Cir.1980) (plaintiff lacked standing because asset sale's effect on competition was wholly independent of harm to plaintiff).

Here, CHH alleges that it will suffer the following injuries as a result of the Offer: (1) the termination of "substantial, direct head-to-head competition" between Contempo and Limited Stores, and between certain of its divisions and Lane Bryant; (2) disruption and uncertainty in the business affairs of CHH; and (3) disclosure of trade secrets which give CHH a "competitive advantage." (Pltf's. Memo. in Support at 23–37.) By implication, CHH also complains that it may suffer the injury of losing its independent existence.

However, each of these alleged injuries does not result from the possibility of substantially lessened competition, but rather derives from the fact that after a successful, albeit unfriendly, merger, two corporate entities become one. Put another way, each of these "injuries" to CHH would occur in the event of a merger, whether or not the merger would substantially lessen competition. Thus, CHH has not alleged an "*antitrust* injury," *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697.

Although the contention that the elimination of competition between Contempo and Limited Stores will have anticompetitive effects sounds in § 7, CHH has no standing to raise it. If the proposed merger is completed, CHH will be a part of the very entity it claims will have a supercompetitive advantage, *i.e.*, it suffers no antitrust harm. As pointed out by Professors Areeda and Turner, it is inconsistent for CHH to complain of this outcome on *antitrust* grounds.[3] Those who will be injured by any anticompetitive effect of the proposed merger and thus have standing to complain under § 7 are consumers and competitors of the surviving corporation.[4]

I conclude that a tender offer target in the circumstances presented here lacks standing to seek injunctive relief for a tender offer's asserted violation of § 7 of the Clayton Act.[5]

## II. *The Relevant Markets*

Whether or not, under § 7, the effect of a proposed merger "may be substantially to lessen competition" can only be tested against the relevant markets—§ 7's "any line of commerce in any section of the country." 15 U.S.C. § 18. "Determination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act." *United States v. Marine Bancorporation*, 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978 (1974) (citations omitted). The burden of proof to establish both relevant markets is on plaintiff. *See Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir.1978) (§ 1 rule of reason case).

### A. *The Relevant Geographic Market*

CHH has proposed two alternative "geographic" markets in which it contends the subject merger may substantially lessen competition. CHH first states that "the shopping malls in which both CHH and

---

**3.** I recognize that there is authority to the contrary in other jurisdictions. *See Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 378 (6th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *Grumman Corp. v. LTV Corp.*, 665 F.2d 10 (2d Cir.1981); *Babcock & Wilcox Co. v. United Technologies Corp.*, 435 F.Supp. 1249 (N.D.Ohio 1977). However, these cases seem only to address the first part of the *Brunswick* test, *i.e.*, "injury of the type the antitrust laws were intended to address." Thus, for example, in *Grumman Corp.* the Second Circuit found that the target company had standing if it could show a "threat to the public interest from the loss of competition." 665 F.2d at 16. And in *Babcock & Wilcox*, the court held that standing exists if it appears "that the interests the plaintiff seeks to protect are arguably within the zone of interests to be protected." 435 F.Supp. 1249. These cases do not address the second part of the *Brunswick* test, *i.e.*, "*and* [injury] that flows from that which makes defendants' acts unlawful." 429 U.S. at 489, 97 S.Ct. at 697 (emphasis added). Thus, these cases appear not to comport with the settled rule of this Circuit that a plaintiff seeking injunctive relief under the Clayton Act must show an injury "resulting from the alleged antitrust violation." *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).

**4.** The government also, of course, has standing to challenge this proposed acquisition. The premerger notification required by § 7A of the Clayton Act, 15 U.S.C. § 18a, was timely filed by Limited. On April 17, 1984, the Federal Trade Commission, pursuant to § 7A(b)(2), granted an early termination of the waiting period prescribed by § 7A(b)(1)(B).

**5.** Because standing implicates the subject matter jurisdiction of this Court, failure to make a threshold showing of standing requires dismissal. *McMichael v. County of Napa*, 709 F.2d 1268 (9th Cir.1983). Accordingly, the § 7 claim will be dismissed. However, because the law of the Circuit has not been established on this issue, I proceed to address the remaining issues on plaintiff's application for preliminary injunction to facilitate efficient appellate review. *See Kemmis v. McGoldrick*, 706 F.2d 993, 997 n. 2 (9th Cir.1983).

Limited operate stores constitute the relevant geographic markets." (Pltf's. Memo. in Support at 19.) Later, it states that "assuming, *arguendo,* that individual shopping malls do not constitute a relevant geographic market for Section 7 purposes, then surely the aggregate of shopping malls in Southern California do." (Pltf's. Memo. in Support at 21.) I find that neither of the markets CHH attempts to define constitutes a relevant geographic market for § 7 purposes.

CHH relies primarily on the leading horizontal merger case, *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), to support its proferred geographic markets. However, *Brown Shoe* does not go nearly as far as CHH suggests. In *Brown Shoe,* the Court stated:

> The criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market.... Moreover, just as a product submarket may have § 7 significance as the proper "line of commerce," so may a geographic submarket be considered the appropriate "section of the country." ... Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both "correspond to the commercial realities" of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area.... The fact that two merging firms have competed directly on the horizontal level in but a fraction of the geographic markets in which either has operated, does not, in itself, place their merger outside the scope of § 7. That section speaks of "any ... section of the country," and if anticompetitive effects of a merger are probable in "any" significant market, the merger— at least to that extent, is proscribed.

*Id.* at 336–37, 82 S.Ct. at 1530 (citations and footnotes omitted). The Court went on to find that the district court "properly defined the relevant geographic markets in which to analyze this merger as those cities with a population exceeding 10,000 and their environs in which both Brown and Kinney retailed shoes through their own outlets." *Id.* at 339, 82 S.Ct. at 1531.

At oral argument, counsel for CHH suggested that the Court could judicially notice that many of the cities which *Brown Shoe* found to be relevant geographic markets had smaller populations than the areas immediately surrounding the regional shopping malls here in question. That is undoubtedly the fact. However, small cities are different in kind from regional shopping malls located in the Southern California metropolitan area. Whereas in the former, competition necessarily is confined on a town-by-town basis, there is no showing here that consumer travel time or any other impediment restricts competition in women's apparel on a mall-by-mall basis. This is apparent in the Court's sentence immediately following that last quoted: "Such markets are large enough to include the downtown shops and suburban shopping centers in areas contiguous to the city, which are important competitive factors, and yet are small enough to exclude stores beyond the immediate environs of the city, which are of little competitive significance." *Id.* at 339, 82 S.Ct. at 1531.

In the case of shopping malls, CHH does not dispute that there are thousands of retail clothing stores in "areas contiguous" to the malls, where consumers can shop for women's fashion apparel or special size apparel, and that there are malls where only one or neither of the parties operates a specialty shop. CHH's contention that once consumers arrive at a mall, competition is confined to that mall, is both untenable and irrelevant for § 7 purposes. The record does not support such a finding. Ample evidence in the record indicates that the malls, whether directly or indirectly, compete with "free-standing" stores, as well as other malls. Moreover, this tells us nothing of how or why consumers make

such a choice and whether it is "exclusive". Indeed, the record indicates no such mall loyalty. CHH's reliance on *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704 (7th Cir.1979), and *Net Realty Holding Trust v. Franconia Properties, Inc.*, 544 F.Supp. 759 (E.D.Va.1982), also is misplaced. *Photovest* held only that there was a relevant *product* market for drive-through photo processing, as distinct from a market for conventional photo processing. The Court specifically stated that it was not deciding the relevant geographic market, but was accepting the geographic market determined by the district court, and agreed upon by the parties. 606 F.2d at 712 & n. 6. This geographic market was the "Indianapolis metropolitan area." *Id.* at 712. *Photovest*, thus, does not support the isolated market pockets which CHH urges this Court to accept.

*Net Realty* states that, "the court suggests that the relevant market for measuring the effect of the developer's exclusionary power is much larger than Springfield Mall. The market probably includes all of the malls within the suburban area of northern Virginia." 544 F.Supp. at 765. This expression must be understood in the context of the product there involved—the leasing of retail space. "The product market in which Springfield Mall competes is the leasing of retail space, not just retail space in regional malls." *Net Realty Holding Trust v. Franconia Properties, Inc.*, [1983–1] Trade Cas. (CCH) ¶ 60,522, at 69,-308 (E.D.Va.1983). Given this product market, *Net Realty* does not support plaintiff's attempted analogy to an aggregate of shopping malls in Southern California as a relevant geographic market for women's apparel. The geographic market in *Net Realty* was suburban northern Virginia, not an aggregate of malls. Indeed, a number of other courts which have considered the question have rejected as economically insignificant any difference between retail stores in shopping malls and other retail stores. *See American Key Corp. v. Cumberland Ass'n*, 579 F.Supp. 1245 [1984–1] Trade Cas. (CCH) ¶ 65,888 (N.D.Ga.1983) (no separate market for retail sales of re-

placement keys in large, regional malls); *Deauville Corp. v. Federated Dep't Stores, Inc.*, [1983–2] Trade Cas. (CCH) ¶ 65,599 at 68,985 (S.D.Tex.1983) (no separate market for retail space in shopping malls because "[i]t is clear that non-mall space is competitive with mall space ... it is irrelevant to consumers and retailers where they respectively buy and sell their products if the location is economically favorable to them"); *Optivision, Inc. v. Syracuse Shopping Center Assoc.*, 472 F.Supp. 665, 677 (N.D.N.Y.1979) (no separate market for shopping mall retail sales of eyeglasses because "there are numerous commercial properties in the relevant geographic market which are suitable as alternative locations for a retail store.").

It is plain that CHH's selected geographic market neither "corresponds to the commercial realities of the industry," nor are they "economically significant." *Brown Shoe*, 370 U.S. at 294, 82 S.Ct. at 1502. Therefore, it is insufficient as a basis for determining whether, as CHH contends, the merger may substantially lessen competition. CHH has failed to carry its burden on this motion to adduce proof sufficient to sustain a finding of a relevant geographic market.

### B. *The Relevant Product Market*

CHH suggests two product markets in which, it contends, it and Limited compete. The first is "moderate-priced women's fashion apparel." The second is "special-sized women's apparel." Neither of these is a sufficiently concise and meaningful definition to constitute a relevant product market for § 7 purposes.

The criteria CHH uses in delineating its suggested product markets are too subjective to be defined in economic terms. For example, CHH contends that the "contours" of the "moderate-priced women's fashion apparel" market are "principally defined by (1) moderate prices, (2) fashion orientation, and (3) the specialty store setting in which the merchandise is sold." CHH further contends that "[t]hese features are designed to attract a distinct

group of customers: fashion-oriented females in the 20 to 40 year age bracket." (Pltf's. Memo. in Support at 11.)

There is no industry or expert agreement on the meaning of "moderate-priced." Numerous witnesses testified to their understanding of the term; understandably, they were not in agreement. The economic significance of "fashion orientation," for § 7 purposes, is even more obscure. On this record, these simply are not terms that can be subjected to economic analysis.

CHH's proffered product market definition also does not adequately address the two aspects of competition which courts and economists must consider in defining any product market. The first aspect is "demand substitutability," that is, the extent to which buyers will switch from one supplier to another when the first supplier raises prices. *See, e.g., United States v. E.I. du Pont Nemours & Co.*, 353 U.S. 586 at 593–4, 77 S.Ct. 872 at 877–8, 1 L.Ed.2d 1057; *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1523. Here, the record amply supports the conclusion that if prices were raised in any shopping mall "specialty" stores, such as Contempo or Limited Stores, consumers could seek similar products in a panoply of other locations, specialty stores or elsewhere.[6] The same is true of customer dissatisfaction with any given "fashion orientation."

The second aspect is "supply substitutability," that is, the extent to which manufacturers or retailers will switch from manufacturing or retailing one product or in one area to another product or area in response to increased market prices or profits in the latter. *See, e.g., United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed.2d 1533 (1948); *Calnetics Corp. v. Volkswagen of America,*

*Inc.*, 532 F.2d 674 (9th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). Here, the record is clear that if any clothing retailer were to gain a supercompetitive advantage in any particular area, new competitors would be attracted to that market. The record indicates that garment manufacturers can easily switch production at little or no cost from, for example, size 16 to size 7 dresses, or from "high-priced luxury items" to "moderately priced fashion apparel." Likewise, clothing and other dry-goods retailers can easily switch from selling one type of item to another in response to increased demand in the latter. For example, CHH's own Neiman-Marcus division is a recent entrant in the "larger-size" market. This entry was made simply by stocking large sizes in "our moderate apparel department." The recent growth of that business is accounted for by "stocking more goods. We began paying attention to the business." (Depo. of Richard Marcus at 12.)

The relevant product market proposed by plaintiff is too amorphous to be subjected to the hard economic analysis required by § 7. It is wholly inadequate and cannot be entertained by the Court as a basis for testing effect on competition.[7]

### III. *Probability of Success on the Merits*

■ Where, as here, proof (and an adequate definition) of the relevant product and geographic markets is absent, it is impossible to assess whether the effect of the acquisition "may be substantially to lessen competition."

■ In this Circuit, the "irreducible minimum" showing required for issuance of a preliminary injunction is "a fair chance of

---

**6.** It is unclear whether CHH's qualifier, "sold in specialty shops," refers to the product market or geographic market. If the reference is to the latter, I reject it for the reasons set forth in Part II.A., *ante.*

**7.** Plaintiff makes only a minimal attempt to define its "special-sized women's apparel" market. CHH contends no more than that Lane Bryant's management considers CHH's The Broadway department stores to be among its

competitors. We are not told where and to what extent actual competition exists, whether potential competition is a factor and who the other competitors in this product market are. Indeed, no relevant geographic market is defined. Because CHH's Reply Memorandum totally ignores the larger sizes, I deem this market claim to be abandoned. If it has not been, it should be; the showing is virtually non-existent.

success on the merits." *Benda v. Grand Lodge, IAM,* 584 F.2d 308, 315 (9th Cir. 1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). Because of plaintiff's lack of standing, it obviously cannot meet this test. Moreover, based on my alternative holding, that plaintiff has failed to define either a relevant geographic market or a relevant product market, the same result follows. I am unable to find that plaintiff has demonstrated a fair chance of success on the merits, that it could prove at trial that the proposed merger may substantially lessen competition under § 7 of the Clayton Act.

IV. *Order*

1. Plaintiff's application for a preliminary injunction is denied.

2. Denial of the application with respect to the Exchange Act claims is without prejudice to the application being renewed on the basis set forth in footnote 2, *ante.*

3. The issue having been fully addressed, the first claim for relief in the amended complaint is dismissed for lack of standing to sue.

4. Because it appears that the second through fifth claims for relief may have been rendered moot by the Amended Offer, plaintiff is hereby granted leave to file a second amended or supplemental complaint within 10 days hereof. F.R.Civ.P. 15(a) & (d).

5. This Memorandum Decision is intended to serve as the Court's findings of fact and conclusions of law pursuant to F.R. Civ.P. 52(a).