**UNITED STATES of America, Plaintiff,**

v.

**BAKER HUGHES INCORPORATED, Eimco Secoma, S.A., and Oy Tampella AB, Defendants.**

**Civ. A. No. 89–3333.**

United States District Court, District of Columbia.

Feb. 21, 1990.

---

**5.** Defendants' motions for summary judgment as to Nautilus's duty to defend are GRANTED.

Anthony V. Nanni, J. Robert Kramer, II, Bruce K. Yamanaga, Charles R. Schwidde, Jerry D. Threet, Antitrust Div., Dept. of Justice, Washington, D.C., for plaintiff.

William J. Baer, Washington, D.C., for Baker Hughes and Secoma.

David Marx, Jr., Chicago, Ill., Ronald A. Bloch, Lizbeth R. Levinson, Washington, D.C., for Tampella.

## MEMORANDUM

GESELL, District Judge.

The United States, invoking Section 7 of the Clayton Act, 15 U.S.C. § 18, seeks by its complaint to enjoin a proposed acquisition on the ground that it may substantially lessen competition in hardrock hydraulic underground drilling rigs. The proposed acquisition has been postponed pending this decision on the merits, which is now before the Court after two days of hearings and the filing of proposed findings of fact. The record consists of numerous exhibits with significant portions highlighted by the parties, affidavits and live testimony from four witnesses. The issues have been fully briefed and argued.[1] Jurisdiction and venue are conceded. This Memorandum constitutes the Court's findings of fact and conclusions of law as to Count One of the complaint.[2]

### The Proposed Acquisition

The proposed transaction involves two foreign corporations which supply hardrock hydraulic underground drilling rigs to customers in the United States and elsewhere in the world operating out of Finland and France, respectively. By an agreement dated July 29, 1989, Oy Tampella AB, a Finnish corporation, will acquire Eimco Secoma, S.A. (Secoma), a French corporation, which is owned by Baker Hughes Incorporated of Houston, Texas. Oy Tampella's Tamrock division and Secoma are each major industrial concerns doing business in a variety of mining products. They compete with each other and other concerns in various countries around the world.[3]

Each company has a separately incorporated small U.S. sales and service subsidiary (Tamrock, Inc. and Secoma, U.S., Inc.) to aid its U.S. sales of the rigs, which Tamrock manufactures and assembles in Finland, and Secoma assembles, primarily from parts made by others, in France.

There are three primary types of hardrock hydraulic underground mining rigs: face drills (often called "jumbos"), roof bolters and long hole drills. These rigs perform different functions in an underground mine or tunnel where hardrock is encountered. Jumbos drill horizontally into the face of the mine tunnel. Roof bolters drill holes vertically into the floor or roof of the tunnel; a bolt is then inserted into the hole and later a brace. Long hole ("production") drills are used to reach into and open up ore bodies. "Hardrock" is rock that requires a drill force of approximately 20,000 pounds per square inch for penetration.

### The Contentions of the Parties

This proposed horizontal acquisition combines two major companies now directly competing in the United States for hardrock hydraulic underground drilling rigs. Tamrock, the acquiring company, has in recent years had the largest share of this country's business in these rigs.

The United States asserts it has met its burden under Section 7 of the Clayton Act

---

1. The Court granted the United States' motion for a temporary restraining order on December 15, 1989. After a full hearing on a motion for preliminary injunction on January 16 and 17, 1990, the parties agreed that, pursuant to Fed.R. Civ.P. 65(a)(2), the record then made should be treated as completed on the merits for purposes of the government's request for a permanent injunction. The case was argued on February 1, 1990.

2. The complaint's other count alleges a violation of the Hart–Scott–Rodino Act. No proof has been taken as to this count.

3. Tamrock contends that its principal interest in acquiring Secoma was to strengthen its position in other markets where Secoma has a strong presence, rather than in the United States.

because the proposed acquisition will increase the already dominant position of Tamrock, which has accounted for about 40 percent of U.S. sales in recent years. Applying traditional antitrust doctrine, *see, e.g., United States v. Philadelphia National Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 1741, 10 L.Ed.2d 915 (1963), against what it considers this decisive circumstance, the United States contends that it is reasonably likely that the proposed acquisition will substantially lessen competition in the sale of hardrock hydraulic underground drilling rigs in a distinct market, i.e. the United States.

Vigorously contesting these premises as overly simplistic, the defendants contend that factors unique to the hardrock drilling equipment business make the conclusions drawn by the Department of Justice inappropriate and the authorities relied on inapplicable. This opposition is not an idle one. It is supported by a factual showing that requires close analysis to determine whether given the nature of this particular industry permanent injunctive relief is in fact required to sustain the objectives of the Clayton Act. The United States has the ultimate burden of proving a Section 7 violation by a preponderance of the evidence.

*The Appropriate Geographic Market*

■ The proof has focused on two markets, the United States and the entire world. Most of the evidence concerns the United States market, for obvious reasons.

References to competition throughout the world were pertinent because, as will be discussed below, some competitors of Tamrock and Secoma based abroad may successfully enter the United States market in the future. Market sales in 1988 of hydraulic rigs throughout the world are noted below.

HYDRAULIC RIGS
WORLD MARKET SALES 1988

|  | Jumbos | Longhole | Bolting | Scaling | Total |
|---|---|---|---|---|---|
| Tamrock | 128(10) | 36(3) | 21(2) | 20 | 205 |
| Atlas–Copco | 77(3) | 13 | 11 |  | 101 |
| Secoma | 36 | 2 | 19 |  | 57 |
| Furukawa | 49 |  |  |  | 49 |
| Montabert | 12 | 2 |  |  | 14 |
| Gardner–Denver | 8 |  |  |  | 8 |
| PTT | 2 |  |  |  | 2 |
| Bohler | 4 |  |  |  | 4 |
| Sig | 2 | 1 |  |  | 3 |
| AMV | 1 |  |  |  | 1 |
| Boart | 5 | 1 | 1 | 1 | 8 |
| Toyo | 12 |  |  |  | 12 |
| Fletcher |  |  | 1 |  | 1 |
| Dux |  |  |  | 1 | 1 |
| Tokyo Ryuki |  |  |  | 1 | 1 |
| Stromnes | 1 | 2 |  |  | 3 |
| XX | 1 |  |  | 1 | 2 |
|  | 338 | 57 | 53 | 24 | 472 |

PX 47.[4]

---

For the years 1986 to 1988, purchasers of hardrock hydraulic underground drilling rigs used only four of the companies listed above to supply rigs for their mining or tunnel work in the United States. For those years, sales in the United States were made by the leading companies as summa-

4. Of the firms listed, only Gardner–Denver and Fletcher are based in the United States.

rized in the following table provided by the Department of Justice:

### 1986 to 1988 U.S. Unit Sales

| Firm | Units | % Share |
| --- | --- | --- |
| Tamrock (Finland) | 42 | 40.8 |
| Atlas Copco (Sweden) | 26 | 25.2 |
| Secoma (France) | 18 | 17.5 |
| Gardner–Denver (U.S.A.) | 17 | 16.5 |
| | 103 | 100.0 |

Secoma improved its position in 1989. Also in 1989, Ingersoll–Rand, Inc., a substantial American concern, re-entered the business and made one U.S. hydraulic jumbo sale for delivery this year. Another U.S. concern, Cannon Industries, also sold a single hydraulic jumbo in 1989. Other firms participated only in a minor way in the U.S. market at one time or another during the last four years.

■ The appropriate geographic market for measuring the probable competitive effect of the proposed acquisition is the United States. While the merging parties are importers contending with strong competition around the world from other foreign concerns, these concerns generally consider the United States a distinct market. Furthermore, the principal focus of the Clayton Act is upon domestic conditions. The world markets are pertinent to exports of rigs by U.S. companies, presently done in a small way by Gardner–Denver and Ingersoll–Rand.

Information concerning sales of rigs in various countries is not precise. Competitive conditions in various countries differ, as do market shares. The position of the merging companies in foreign markets varies, although measured by the years 1986–1988 Tamrock–Secoma's position in the United States is approximately the same as it is in the world. In some particular foreign countries, however, different foreign companies not subject to the reach of the

Clayton Act have much greater market strength than a combined Tamrock–Secoma. There is no proof which enables the Court to appraise the effects of the proposed acquisition in foreign markets. On the other hand, the competitive conditions in the United States have been adequately developed, and likely developments have been explored.

■ Section 7 of the Clayton Act is aimed at ensuring competitive effect "in any section of *the country*" (emphasis added). 15 U.S.C. § 18. Moreover, there are attributes of the United States market which separate it and distinguish it from other world markets, and it is not so intermeshed with the trade and business elsewhere that it is not itself distinct, separate and different, as subsequent discussion of the nature of the competition will illustrate. The competitive effect of the proposed acquisition within the United States is economically significant and that market must serve as the geographic standard for appraising its likely consequences.[5]

### The Appropriate Line of Commerce

The appropriate "line of commerce" for appraising the competitive effect of the proposed merger is claimed by the Department of Justice to be the sale of the three different types of hardrock hydraulic underground drilling rigs previously noted. This proposed product line is one developed largely for litigation purposes and as such must be considered with skepticism and qualifications.

■ The appropriate line of commerce for Clayton Act purposes must be chosen in terms of the realities of the business situations involved. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Where there are marginal or substitute products or al-

---

**5.** The defendants, citing a diplomatic note from the Embassy of Finland opposing the blocking of the merger, argue that the Court should decline to exercise jurisdiction based on principles of international comity. However, whatever the relevance of comity concerns in antitrust disputes between private parties, *see Laker Airways, Ltd. v. Sabena*, 731 F.2d 909, 938 (D.C.Cir. 1984), they are not a factor here. The State Department has considered Finland's position, and the United States has decided to go ahead with the case. It is not the Court's role to second-guess the executive branch's judgment as to the proper role of comity concerns under these circumstances.

ternative methods of achieving a particular function, these need to be considered in selecting a line of commerce even though they may not overall have a direct effect upon all aspects of the principal competition between the combining entities.

In this instance, both Tamrock and Secoma directly compete in the United States by soliciting business and selling hardrock hydraulic underground drilling rigs to the same class of customers and for the business of the same customers. However, Secoma does not compete with Tamrock for the sale of the largest-sized jumbos. On the other hand, if a mine uses a Tamrock jumbo there is no showing it could not use a Secoma roof bolter.

There are also various types and combinations of pneumatic drilling rigs designed to perform many of the same functions as the hydraulic drilling rigs underground. These pneumatic drills have slight influence on competition for hardrock drilling. During the late 1970s hydraulic drilling rigs were introduced into the U.S. and began capturing sales from pneumatic drilling rigs in underground hardrock mines. Displacement of new pneumatic drilling rigs by new hydraulic drilling rigs in underground hardrock mines was completed in the United States by the mid–1980s; no new pneumatic rigs have been sold for hardrock underground mining since 1985. When used to perform the same function as hydraulic rigs, pneumatics are usually more expensive, less efficient, noisier, slower, less powerful and consume more power. Hydraulic rigs represent the accepted state of the art, and they have a longer life (about 10 years). They far better accommodate heavy duty hardrock underground drilling, particularly for long-term mining and tunnel work, which is the principal use.

On the other hand, pneumatics are a substantial factor for other types of underground drilling, i.e. coal and softer rock. In narrowing the competitive area to hardrock underground rigs the nature of the underground drilling business is somewhat distorted.

Even if pneumatics are set aside and hardrock hydraulic underground rigs are considered separately, the line of commerce remains murky to say the least. Clearly, the line of commerce should include the sale of rig parts and components. Rigs are self-destructive by the very nature of their function and drills as well as other parts must be frequently replaced. Prompt service in this regard is a strong selling point.

Hardrock hydraulic rigs are also to some extent available on a rental basis. Smaller companies that furnish parts or components or rent hydraulic rigs are not a major factor overall, but in particular circumstances they can have some price influence with a specific customer who has short term or limited needs.

Another difficulty with the asserted line of commerce is that it lumps together three distinct types of rigs, each of which performs a distinct function. The motivation for this grouping was presumably to create a less-than-trivial line. One justification for the grouping would be that buyers would prefer to buy all of their hardrock hydraulic underground rigs from one seller, but the evidence on that point is far from conclusive. Another reason for the grouping would be that line of commerce may be determined by focusing on the supply side, i.e. the commonality of production facilities. *See Brown Shoe Co.*, 370 U.S. at 325 n. 42, 82 S.Ct. at 1524 n. 42. However, a supply side approach is problematic, because hydraulic rigs may also share production facilities with surface and pneumatic drilling equipment.

Thus there is a strong argument that "[t]he relevant product market proposed by plaintiff is too amorphous to be subjected to the hard economic analysis required by § 7." *Carter Hawley Hale Stores v. Limited, Inc.*, 587 F.Supp. 246, 253 (C.D.Cal. 1984).

It is with considerable uncertainty and the qualifications noted that the Court accepts the asserted line of commerce for purposes of its analysis of competitive effect. However, the line of commerce must at a minimum include not only the three types of new hydraulic rigs but also suppliers of spare parts, rig components, used rigs and accessories. So defined, the line

offers greater opportunity for gradual entry, and the significance of potential competition in determining competitive effects of the acquisition is enhanced. In addition, the Court concludes that by artificially shrinking the line of commerce, the government has limited somewhat the significance of the market share figures submitted.

### The Nature of Competition in the United States

Hardrock hydraulic underground drilling rigs are not a shelf item. The rigs are assembled and custom made to suit each purchaser's needs and specifications. Customers normally seek bids from two or three suppliers, specifying the general nature of their requirements. A proposed rig or combination of rigs is then developed to meet engineering and technical requirements of the customer and presented, along with a price quote. Proposals may then be modified in consultation with the customer. When final proposals are firmed, the original price may be shaved in an effort to win the bid. This process may take a year or more. During the process, a supplier may not even know which suppliers have been solicited by the customer or the price or price range being quoted by competitors.

There are economies of scale that give large producers such as Tamrock and Secoma cost advantages over smaller competitors. These economies result from volume purchases and labor specialization. Price is not the only determining factor in closing a sale, even though it plays a distinct role which may vary with the circumstances, such as the work involved, the customer's financial condition, and prior contacts between buyer and seller. Rigs sell currently in the range of several hundred thousand dollars and orders, which are frequently for more than one rig, often range above $1 million.

Tamrock considers itself the market leader in the United States. It emphasizes technical capacity, creative orientation, product line, availability, good service, cost efficiency and risk sharing with the customer. At the stage of final consideration of a bid it attempts to close by price reduction and by emphasis upon the quality of its products. Pricing by both Secoma and Tamrock, as well as other competitors, is flexible at the final stage of a sale.

Since new rigs are a custom made product, the customer places great emphasis upon the supplier's reputation for quality and service. Rigs are almost literally eaten up as they work. Parts and drills frequently have to be replaced. A company's reliability in servicing the equipment is a key competitive factor. Tamrock obtained substantial income, approximately $200,000 a month, by sale of spare parts in the United States in a single recent year. Tamrock had expressed concern over Secoma's low part prices offered in 1987 in the United States.

If a customer has already installed a particular supplier's rigs, that prior sale can advantage the seller in two important ways. Where prior service and quality are known to be highly satisfactory, the customer is naturally drawn to return to that supplier, particularly if the new equipment being purchased will be working in the same mine or tunnel with other equipment bought from the same supplier. Another factor also plays a part: Customers tend to have needs for other types of nondrilling equipment. Companies with a full line of related products and accessories emphasize this as an advantage. Where customers are already dependent on the seller for other types of equipment, this may solidify the relationship to the point where the seller's rigs are favored.

Companies already regularly selling hardrock hydraulic underground drilling equipment in the United States have one or two travelling sales representatives to locate potential business and to serve existing customers. They are supported by inventories of replacement drills and parts warehoused to assure prompt service, sometimes close to a mine. It is inexpensive to develop a separate sales and service network in the United States. The costs of such a network can be spread over the manufacturer's entire product line, including surface equipment and underground

equipment other than drilling rigs. Secoma has only three employees in the United States: a salesperson, a technical service representative, and an administrator.

Finally, the narrow nature of the line of commerce urged by the government results in insignificant figures. The number of underground rigs sold annually is so small that at any given point in time an individual seller's future competitive strength may not be accurately reflected. From 1986 through 1988, Tamrock sold between 33 and 42 hydraulic underground drilling rigs to United States customers.[6] During the same period, Secoma sold in the United States only 18 or 19 rigs, valued at about $2.5 million. The minuscule size of the market creates problems for the government's case, because one element of a Section 7 violation is that "[t]he market must be substantial." *United States v. Dupont & Co.*, 353 U.S. 586, 595, 77 S.Ct. 872, 878, 1 L.Ed.2d 1057 (1957).

### Competition between Tamrock and Secoma

Because of the nature of the products sold and the fact that the volume of business done is relatively small and customers' needs for new equipment are irregular, market shares in the line of commerce alone are not an accurate measure of market dominance. A company may sell a substantial number of units in one year and far more or far less in another. Percentages that appear large may represent only a single sale.

Secoma, like Tamrock, is a substantial company doing business in many regions, including Europe, Africa, Asia, and Latin America. It originally entered the United States drilling rig market in 1978. Between 1983 and 1984, during a period of extremely depressed U.S. sales for the entire industry, Secoma sold no hardrock underground drilling rigs in the United States. However, Secoma has been continuously improving its hydraulic equipment based on experience and has widened its line. It developed its U.S. market position by cutting profit margins and bidding low for parts and components. As it became established in the United States its prices became more in line. Its product line has been of good quality but generally lower priced and somewhat less sophisticated than Tamrock's for meeting certain hardrock conditions. In 1989, it was the leading seller of jumbos.

Tamrock has considered Secoma its most significant rival after Atlas Copco in all markets served by Tamrock and potentially an even stronger threat to Tamrock's world leadership if it improved the efficiency of its after sales services.

Secoma competes vigorously in the market with equipment that is competitive for a significant and substantial segment. During the period January 1987 to October 1989, Secoma bid on 43 underground hardrock hydraulic drilling rigs to be supplied to customers in the United States, 28 of those in direct competition with Tamrock. According to an Atlas–Copco official who testified as a government witness, in 1989 in the jumbo segment of the United States hardrock hydraulic underground drilling rig market, Secoma sold about nine machines; Tamrock about seven machines; Atlas Copco six machines; and Gardner Denver about four machines. In addition, Cannon and Ingersoll–Rand each sold one jumbo in 1989.

An internal Tamrock analysis of its jumbo bid results from 1987 to 1989 indicates it was competing with Secoma and others in a number of still open bids, that it had lost bids to Secoma on bids covering five units, and that in 1989 it lost a major purchase to Secoma. According to the analysis, Tamrock lost other bids, but the company was apparently unaware of which competitor was awarded the business.

Thus it is clear that the proposed horizontal acquisition combines two firms, each

---

6. Tamrock, in answers to interrogatories, asserts that it sold only 33 rigs, valued at $7.8 million in the United States in this period. PX 68 at 14, 24, 33. The United States asserts that these figures are inconsistent with Tamrock internal documents and Secoma's interrogatory answers, which indicate that Tamrock sold 42 rigs in this period. Froeb declaration at 7. The Court does not find in the record an indication of the total value of the 42 rigs.

already successfully established in the United States, whose individual or combined shares measured over a period of years have Clayton Act significance. Business shifts back and forth between them based on price, quality and service. Each company follows the other's pricing closely, and Tamrock has shaved its prices to meet Secoma's.

If the acquisition had occurred in 1988, as originally contemplated, the combined companies would have accounted for 66 percent of hydraulic underground rig sales that year. This figure, as indicated, represents the major portion of the line of commerce under consideration.

Whether these positions in the market will persist following the acquisition requires further analysis. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

Ingersoll–Rand has studied the United States and worldwide markets and has an informed, concrete current plan to gain significant market shares by developing and offering a broad line of equipment, spare parts and accessories. It has made a substantial sale in the Soviet Union and has a hydraulic rig order in the United States. Given its base in the United States it is potentially a strong substitute for Secoma in hydraulic rig sales competition. Moreover, another U.S. concern, Cannon, sold one jumbo last year and may be poised to make future U.S. sales.

### Potential Competition

Apart from this re-entry of Ingersoll–Rand and entry of Cannon, other potential competition must be taken into account when prognosticating likely competitive trends. *Brown Shoe Co.*, 370 U.S. at 320–22, 82 S.Ct. at 1522; *United States v. Penn–Olin Chemical Co.*, 378 U.S. 158, 174, 84 S.Ct. 1710, 1718, 12 L.Ed.2d 775 (1964).

A considerable commitment of time and capital is necessary to be a major factor in the small United States market for hardrock hydraulic underground drilling rigs. Because any company must be able to sell abroad as well as here to sustain sufficient business, the likelihood of new U.S. companies entering the field is slight. Although the United States market is expected to grow because of new construction and mining projects, the growth cannot be quantified and, in the nature of things, will be gradual.

That other well-established foreign companies may enter the United States hydraulic rig market is far more likely. As previously noted, substantial foreign concerns selling hydraulic rigs exist in Western Europe, the Far East and Canada. Since the proposed acquisition eliminates one of the major U.S. competitors, it is urged that one or more of these concerns are poised, ready, willing and able, to begin selling here. They would enter, presumably, just as Secoma did, and entry in this manner by established concerns would be relatively easy.

Obviously, the future impact of these companies, or some of them, on U.S. competitive conditions must be taken into account when appraising the likely level of future competition. Defendants urge that a sales presence can be established at little expense, and that a company with established reputation for quality service and reliability abroad can provide U.S. customers with ample assurance of its success by putting them in contact with foreign users of the new entrant's equipment. Defendants also argue that most of these foreign concerns compete effectively abroad, are well capitalized and technically competent, and will enter by reducing price, which will prevent the newly combined Tamrock–Secoma from exercising any market power its share implies. More specifically and perhaps more importantly, it is suggested that those foreign concerns already established in the larger Canadian market are in a particularly satisfactory position to do business in the United States. There is some proof that bears on these contentions.

Eight companies currently are competing for sales of underground hardrock hydraulic drilling equipment in Canada. These include—in addition to Tamrock, Atlas Copco, Secoma, and Gardner Denver, which are already in the U.S.—Boart, CMS/Monta-

bert, Sig, and Bohler. There is sparse evidence that any of these companies operating in Canada has made a firm, long-term commitment to enter with the possible exception of Boart, which has a United States sales and service office backed by Canadian personnel. Indeed, most foreign manufacturers of hardrock hydraulic underground drilling rigs who tested the United States market in the past have apparently backed off.

CMS, a leading Canadian hydraulic rig maker that sells drills manufactured by Montabert, a French company, had no success in ten to twelve attempts in 1989 to sell underground drilling rigs in the United States. Moreover, the president of CMS/Montabert states that his firm is likely to abandon efforts to enter the U.S. market if Tamrock acquires Secoma, because the combination would indicate Tamrock's intention to dominate the market.

The opportunity to enter has existed for some years. Some U.S. mine purchasers operating abroad have undoubtedly had contact with some of these concerns. The failure to seize the opportunity here suggests difficulty of entry. It appears likely to the Court, however, that if Secoma becomes part of Tamrock, one or two of these companies will enter successfully sometime in the future, because major United States customers, who are quite sophisticated and financially strong, will insist on receiving alternative bids. There was evidence that there will be increased demand for hydraulic rigs in Alaska, a region that should be particularly attractive to firms now selling in Canada.

The impact on competition in the United States of such new entry is not readily ascertainable because the small size of the U.S. market makes the strength of the concerns already established here hard to measure.

### Likely Effect of Acquisition on Competition

The Court finds that the proposed acquisition is likely to have the immediate and direct effect of lessening some competition in the sale of hardrock hydraulic underground drilling rigs in the United States. Existing price competition between Secoma and Tamrock will be eliminated but price competition will persist. Tamrock is likely to improve its already major position in the market by being able to offer a wider range of products in the line and expand service. It will have greater flexibility in manipulating price during bidding. However, although Ingersoll–Rand will face stronger opposition both in the United States and in the world market, it will likely be able to re-enter. Moreover, while competition is likely to be lessened immediately if the proposed acquisition is completed, long-range prospects in the market, while uncertain, are favorable to new entry which will ensure continued vigorous competition.

### Substantiality and Discretion

There remains finally the question whether the effect of the proposed acquisition "may be substantially to lessen competition" within the meaning of Section 7 of the Clayton Act. Clearly a substantial market effect in this regard must be shown to be reasonably likely before an injunction is warranted.

Although concentration will increase to some degree in the United States market, market shares are volatile and shifting. Price competition will remain keen because the increased size of market share that Tamrock would gain does not significantly increase its power over price given the nature of the bidding process and the sophistication of customers. Ingersoll–Rand and Cannon have each recently sold a jumbo, and a single sale is not an insignificant number in this market. Moreover, it is difficult to ignore the clear probability that the United States market will attract one or more concerns now selling in Canada.

The understandable antipathy to increased concentration which underlies antitrust policy as expressed by the Supreme Court in *Philadelphia National Bank, supra,* and *United States v. Aluminum Co. of America,* 377 U.S. 271, 279, 84 S.Ct. 1283, 1288, 12 L.Ed.2d 314 (1964), does not fit the competitive conditions shown by the

proof in this case. *See United States v. General Dynamics, supra.* This is mainly an import market involving relatively new types of mining machinery pioneered abroad. No company manufacturing hardrock hydraulic underground rigs can expect substantial business unless it does business abroad. Even the line of commerce involved is somewhat uncertain and definitely unrealistic in a management sense. Customers are highly sophisticated and financially strong. Competition will not cease.

Very few current U.S. customers for hydraulic rigs have been turned up by the government's thorough investigation who are willing to express any objection to the acquisition, even by self-serving affidavit.[7] The amount of business is very small. Concentration has existed for some time but there is no proof of overpricing, excessive profit or any decline in quality, service or diminishing innovation. And, finally, although motive to lessen competition is not a major issue in a Clayton Act case, the Court notes that the proof indicates that the acquisition occurred for reasons involving little or no consideration of the United States market.[8]

### Conclusion

In the light of the foregoing, the Court finds that it is not likely that the acquisition will substantially lessen competition in the United States either immediately or long-term, that the greater concentration in the United States is not a reliable measure of increased power over the price of hardrock hydraulic underground drilling rigs, and that it is likely that competition will continue to be vigorous due to the recent entry of Ingersoll–Rand and Cannon and the expected increased sales efforts in the United States of established concerns poised in Canada or already testing the United States market.

Count One of the complaint must therefore be dismissed because the United States has failed to meet its burden. An appropriate Order is filed herewith.

### ORDER

This case having come before the Court for hearing on the United States' request for permanent injunction, and the Court having this day filed a Memorandum constituting its findings of fact and conclusions of law, it is hereby

ORDERED that the United States' request for permanent injunction is denied; and it further

ORDERED that Count One of the complaint is dismissed; and it is further

ORDERED that the parties shall appear at a status conference on March 2, 1990, at 2:00 p.m. in Courtroom No. 6 to discuss proceedings relating to Count Two.

---

7.  Ironically, the customer with the least equivocal objection—he says that his firm is "not happy" about the prospect of the merger—is the customer who purchased a hydraulic rig from new entrant Cannon Industries. Another active customer, indicated that the merger "could be construed to risk creating a monopoly. . . ." A third affiant, the customer who recently bought an Ingersoll–Rand hydraulic rig and who does not anticipate buying another rig in the foreseeable future, opined that *if* the merger reduced hydraulic rig sellers in the U.S. to five or six, "then I would be concerned that Tamrock may be trying to corner the market and increase equipment prices. I would then be opposed to Tamrock's acquisition of Eimco Secoma."

8.  Intent to restrain trade is not a necessary element of a Section 7 violation, *United States v.*

*Dupont & Co.,* 353 U.S. at 607, 77 S.Ct. at 884, but the United States has pointed to what it considers a smoking gun in the case to explain why it seeks to stop a merger of marginal domestic significance and which few customers have protested. The smoking gun is a memo by a Tamrock executive bluntly stating that acquisition of Secoma would allow Tamrock to "manipulate the market more effectively" and gain "more flexibility in price setting." Tamrock has tried to distance itself from the memo, crediting it to an inexperienced low-level worker, but the more important point is that the memo clearly indicates that Tamrock concern about price competition from Secoma focused on the world generally and particularly on markets such as the Soviet Union and China and not on the small U.S. market. *See* PX 15 at 12910.